152 P.3d 604

Rodney GRIFFITH and Carla Griffith, husband and wife, individually and dba Boswell Farms, Plaintiffs-Counterdefendants-Respondents-Cross Appellants,

v.

CLEAR LAKES TROUT CO., INC., an Idaho corporation, Defendant–Counterclaimant–Appellant–Cross Respondent.

No. 32385.

Supreme Court of Idaho,
Twin Falls, November 2006 Term.

Jan. 31, 2007.

Ringert Clark Chartered, Boise, for appellant. James G. Reid argued.

Robertson, Hepworth, Slette, Worst & Stover, Twin Falls, for respondents. Jeffrey J. Hepworth argued.

SCHROEDER, Chief Justice.

This is a dispute between Clear Lakes Trout Co., Inc. and Rodney and Carla Griffith concerning enforceability of an agreement to provide "market size" fish, a term subject to interpretation. Also at issue is whether the damages awarded by the district court were sufficiently proved, and whether the district court's award of attorney fees was proper.

## I.

## FACTUAL AND PROCEDURAL BACKGROUND

Clear Lakes Trout Co., Inc. ("Clear Lakes"), which operates a fish hatchery, entered into an arrangement with Rodney and Carla Griffith, d/b/a Boswell Farms ("Griffith"), a trout grower, under which Griffith would purchase small trout from Clear Lakes and sell them back when they had grown to "market size." The parties did business on a casual basis prior to September 1998, at which point they executed an Agreement that is the subject of this dispute. Under the Agreement Clear Lakes agreed to sell Griffith "small trout" in sufficient quantities to allow Griffith to grow "up to two million pounds live weight" each year. Griffith would then sell the trout back to Clear Lakes "when the trout are grown to market size." The small trout were priced according to a local index, and the market size trout were sold at a set rate per pound. Payment for the small trout was not due until they were resold to Clear Lakes at market size, at which point the payment to Griffith would be partially offset by the amount due Clear Lakes. The Agreement was to last six years from September 1998 to September 2004, and provided for the "market size" price to be renegotiated after the second and fourth years.

The parties performed satisfactorily from September 1998 to September 2001. After September 11, 2001, however, the market for trout changed significantly as Clear Lakes' customers began to demand larger size fish. As the market for the 12 to 16 ounce fish produced by Griffith began to dry up Clear Lakes began taking deliveries much later and in smaller loads, leaving Griffith with overcrowded ponds and tightened cash flow.

By 2002 Griffith was experiencing financial difficulties and told Clear Lakes they were "going to have a wreck" because of the slow-down in volume. Clear Lakes promised to "do a better job" and work with the Griffiths. The parties agreed to extend the term of the contract for one year to 2005. The problems worsened during the succeeding year. At some point Clear Lakes offered to pay $125,000, plus let Griffith sell the remaining fish on hand, but Griffith faced nearly $600,000 in debt and was doubtful that it could find a market for the fish any better than Clear Lakes could. Consequently Griffith rejected the offer. Clear Lakes ultimately took delivery of the remaining fish and sold them to a mink farm for almost nothing, reflecting that there was little or no market for the trout at that time. Griffith refused to take a further shipment of small trout from Clear Lakes, and the contract was terminated near the end of the fifth year in August 2003.

Griffith filed suit in September 2003, alleging that Clear Lakes had breached the contract "by refusing to accept and purchase in a timely manner the trout that the Griffiths had grown to market size." Griffith alleged the delays and overly frequent harvests resulted in overcrowded conditions, reduced water quality, and increased stress on the fish, which in turn required increased expenditures for feed and labor and caused excessive mortality losses. The reduced capacity to restock ponds further strained Griffith's cash flow. Clear Lakes counterclaimed for amounts owing on several shipments of small trout that had not been settled.

Clear Lakes moved for summary judgment, claiming that no contract was ever formed because the parties held fundamentally different interpretations of "market size." Clear Lakes claims "market size" varies according to whatever its customers demand, whereas Griffith asserts the term has a more static definition and refers to fish approximating one pound live weight. Griffith also filed a cross motion for summary judgment on the issue of breach based on its interpretation of "market size." The district court denied both motions and held a court trial in March 2005.

The district court found that the parties intended "market size" to refer to fish approximating one pound live weight, and that Clear Lakes had breached its duty to take timely deliveries under the contract. The district court awarded Griffith damages for its lost profits during the fourth and fifth years of the contract (September 2001 to September 2003) based on the increased cost

of producing fish and the increased mortality losses. It refused to grant lost profits based on additional fish that could have been raised during those years, as well as during the remaining years of the contract (September 2003 to September 2005), finding that the potential for raising additional fish was too speculative to support an award of damages.

Clear Lakes appeals, arguing that no contract was ever formed and that Griffith's damages were not proved to a reasonable certainty. It also contests the district court's award of attorney fees to Griffith. Griffith cross appeals, arguing that the district court should have granted lost profit damages for additional fish that could have been raised during the last two years of the contract. Both parties request attorney fees on appeal.

## II.

### STANDARD OF REVIEW

 The review of a trial court's decision after a court trial is limited to ascertaining "whether the evidence supports the findings of fact, and whether the findings of fact support the conclusions of law." *Idaho Forest Industries, Inc. v. Hayden Lake Watershed Imp. Dist.*, 135 Idaho 316, 319, 17 P.3d 260, 263 (2000). The trial court's findings of fact will not be set aside unless clearly erroneous. *Id.*; *see* I.R.C.P. 52(a). Thus, if the findings of fact are supported by substantial and competent evidence, even if the evidence is conflicting, this Court will not disturb those findings. *Idaho Forest Industries, Inc.*, 135 Idaho at 319, 17 P.3d at 263. In view of the trial court's role to weigh conflicting evidence and testimony and to judge the credibility of witnesses, the trial court's findings of fact will be liberally construed in favor of the judgment entered. *Sun Valley Shamrock Resources, Inc. v. Travelers Leasing Corp.*, 118 Idaho 116, 118, 794 P.2d 1389, 1391 (1990). In reviewing a trial court's conclusions of law, however, a different standard applies: this Court is not bound by the legal conclusions of the trial court, but may draw its own conclusions from the facts presented. *Idaho*

*Forest Industries, Inc.*, 135 Idaho at 319, 17 P.3d at 263.

*Indep. Lead Mines Co. v. Hecla Mining Co.*, 143 Idaho 22, 26, 137 P.3d 409, 413 (2006).

## III.

### THE DISTRICT COURT DID NOT ERR IN CONCLUDING THAT A VALID CONTRACT WAS FORMED

 Generally the presence of an ambiguous term in a contract document presents an issue of interpretation, requiring the trier of fact to determine the intent of the parties. *Indep. Lead Mines*, 143 Idaho at 26, 137 P.3d at 413; *Elec. Wholesale Supply Co. v. Nielson*, 136 Idaho 814, 822–23, 41 P.3d 242, 250–51 (2001). In some cases, however, parties attribute such different meanings to the same term that there has been no "meeting of the minds" which is necessary for contract formation. *See Barry v. Pac. West Constr., Inc.*, 140 Idaho 827, 831, 103 P.3d 440, 444 (2004). An agreement that is so vague, indefinite and uncertain that the intent of the parties cannot be ascertained is unenforceable, and courts are left with no choice but to leave the parties as they found them. *Barnes v. Huck*, 97 Idaho 173, 178, 540 P.2d 1352, 1357 (1975).

 According to *Barnes*, "The law does not favor, but leans against, the destruction of contracts because of uncertainty . . . ." *Id.* Mere disagreement between the parties as to the meaning of a term is not enough to invalidate a contract entirely; the applicable standard is reasonable certainty as to the material terms of a contract, not absolute certainty relative to every detail. *Id.* Under the Uniform Commercial Code, "a contract for sale does not fail for indefiniteness if the parties have intended to make a contract and there is a reasonably certain basis for giving an appropriate remedy." I.C. § 28-2-204(3). Thus, "[i]n order to have an enforceable contract, the UCC does not require a document itemizing all the specific terms of the agreement. Rather, the UCC requires a determination whether the circumstances of the case, including the parties' conduct, are 'sufficient to show agreement.' " *Paloukos v. Intermountain Chevrolet Co.*, 99 Idaho 740, 743,

588 P.2d 939, 942 (1978). Whether the parties intended to form a contract is a question of fact to be determined by the trier of fact. *See Barry*, 140 Idaho at 832, 103 P.3d at 445 (upholding trial court's finding that there was a meeting of the minds because there was evidence in support); *Paloukos*, 99 Idaho at 743, 588 P.2d at 942 (reversing a grant of summary judgment because the alleged facts could support a conclusion by the trier of fact that the parties intended to enter a binding contract under I.C. § 28–2–204).

Clear Lakes urges that this case is similar to *Raffles v. Wichelhaus* ("the *Peerless* case"), 2 H. & C. 906, 159 Eng. Rep. 375 (Ex. 1864), in which an agreement to ship cotton aboard the "Peerless" was held unenforceable because there were in fact two different ships by that name unbeknownst to the parties, and each party was referring to a different ship. Clear Lakes argues that its interpretation of the term "market size" was so drastically different from Griffith's understanding that they cannot be said to have had a meeting of the minds. According to Clear Lakes, Griffith understood the term to refer to a static measure approximating 12 to 16 ounces in size, whereas Clear Lakes intended the term to refer to Clear Lakes' own downstream market, which could vary substantially over time according to the preferences of its customers, within a range from 12 to 50 ounces. The parties' expectations were relatively compatible during the first three years of the contract because Clear Lakes' customers were demanding the smaller fish that could be used for frozen fillets. After September 2001, however, the market for frozen products declined and the needs of Clear Lakes' customers shifted to require larger fish, and the parties' allegedly different interpretations became apparent.

In summary judgment proceedings the district court held that any disagreement between the parties regarding "market size" was not so fundamental as to "go to the heart of the very essence of the contract." Following trial the district court found that Clear Lakes and Griffith did not actually disagree as to the meaning of "market size" at the time of formation of the contract.

**1. Substantial evidence supports the district court's finding that any difference of interpretation as to the term "market size" did not defeat contract formation.**

▋ The district court found that "[t]he parties undoubtedly intended to make a contract and there is a 'reasonably certain basis for giving an appropriate remedy.'" The district court's statement is consistent with I.C. § 28–2–204(3):

> Even though one or more terms are left open a contract for sale does not fail for indefiniteness if the parties have intended to make a contract and there is a reasonably certain basis for giving an appropriate remedy.

Substantial evidence supports the district court's conclusion. The fact that the parties' interpretations coincided during the first three years of the contract is persuasive. *See* Restatement (Second) of Contracts § 20, reporter's note (1981) (suggesting that a contract should be held nonexistent only where the disputed term "could have either but not both meanings"). The district court also placed weight on the course of negotiation and the prior course of dealing. Again these are persuasive facts supporting the district court's conclusion.

**2. Substantial evidence supports the district court's finding that the parties did not disagree as the meaning of the term "market size."**

▋ The district court found that at the time of contract formation "Clear Lakes and Griffith had an understanding about what fish were 'market size.'" Specifically, "as between Griffiths and Clear Lakes, the term is suggestive of a trout approximating one pound as the parties had considered it over the years." This finding is significant in determining whether Clear Lakes breached and negates the contention that there was no meeting of the minds as to the meaning of the term.

The district court found that the course of performance between the parties over the first three years of the contract, as well as their course of dealing prior to executing the Agreement, confirmed that the parties in-

tended market size to indicate trout approximating one pound live weight. Griffith also presented evidence of similar trade usage predating the contract.

The Agreement itself, construed as a whole, also contained indications that parties' understandings were consistent with each other. The Agreement states:

> Harvesting of a crop or lot is typically done in two procedure [sic] or harvests. The first harvest is the larger or market size trout and the second harvest is done later after the smallest trout continue to grow and reach market size.

Both parties agreed it was in their interest to have "continuous and uniform delivery" each month. The district court found that these terms were inconsistent with the notion that market size might vary dramatically, since altering the required size might entail varying the delivery schedule and increasing the number of harvests.

Finally, the district court found that Clear Lakes' delivery requests never specified a certain size of fish, but merely specified a total weight for each load. Clear Lakes never explicitly ordered Griffith to grow larger fish except on one special occasion when it provided a different kind of fish for that purpose and Griffith agreed to make special arrangements to accommodate the request.

The evidence cited by the district court is sufficient to support its finding that both parties understood the term "market size" to refer to a fixed range approximating one pound live weight.

## IV.

### THE COURT WILL NOT DISTURB THE DISTRICT COURT'S CONCLUSION THAT CLEAR LAKES BREACHED THE CONTRACT

■ Clear Lakes argues that even if there was a contract, it did not require Clear Lakes to buy fish from Griffith at specified times. According to Clear Lakes, the district court's finding that the contract required delivery within a certain time and required two harvests is unsupportable, since even Griffith agreed that the Agreement contained no language specifying a period of time within which Clear Lakes must buy back the fish. More generally, Clear Lakes argues that its definition of "market size" is the correct one.

The district court found that the language regarding the "typical" number of harvests and the need for "continuous and uniform delivery" were sufficient to indicate an implied obligation to take deliveries within a reasonable time and with limited frequency. There is evidence supporting the district court's findings regarding the delivery schedule contemplated by the parties and Clear Lakes' failure to adhere to it.

## V.

### THE DISTRICT COURT'S FINDINGS REGARDING LOST PROFIT DAMAGES WERE NOT CLEARLY ERRONEOUS

The district court found that Griffith was injured by Clear Lakes' failure to "timely accept delivery of the trout according to the terms of the contract." The delays forced Griffith to continue feeding and caring for the fish beyond the time when Clear Lakes should have taken delivery. Griffith also continued to bear the risk of loss, which was significant because the overcrowded conditions and increased frequency of harvests put more stress on the fish and resulted in higher mortality rates than in previous years. In addition to these direct costs, Griffith failed to realize the profits from additional fish it would have raised but for the reduced capacity and increased financing costs occasioned by Clear Lakes dragging out the process. Finally, Griffith failed to realize the profits it would have earned during the remaining two years of the contract had it not been terminated prematurely.

The district court granted lost profit damages for the increased cost of raising fish during years four and five of the contract. It also granted damages for increased mortality losses during the same period. It refused to grant damages for fish not raised, finding that the potential of raising additional fish was too speculative to support an award of damages. Griffith's award was offset by

amounts owed to Clear Lakes for small trout delivered under the contract. The district court amended its judgment with respect to the offsets, but it refused to alter its conclusion that the prospect of raising additional fish was overly speculative.

 "A district court's award of damages will be upheld on appeal where there is sufficient evidence supporting the award." *Sells v. Robinson*, 141 Idaho 767, 774, 118 P.3d 99, 106 (2005) (citing *Bumgarner v. Bumgarner*, 124 Idaho 629, 641, 862 P.2d 321, 333 (Ct.App.1993)). The evidence is sufficient if it proves the damages with reasonable certainty. *Inland Group of Companies v. Providence Washington Ins. Co.*, 133 Idaho 249, 257, 985 P.2d 674, 682 (1999) (citing *Hummer v. Evans*, 129 Idaho 274, 280, 923 P.2d 981, 987 (1996)) ("Compensatory damages for lost profits and future earnings must be shown with a reasonable certainty."). Reasonable certainty requires neither absolute assurance nor mathematical exactitude; rather, the evidence need only be sufficient to remove the existence of damages from the realm of speculation. *Fuller v. Wolters*, 119 Idaho 415, 422, 807 P.2d 633, 640 (1991) (quoting *Big Butte Ranch, Inc. v. Grasmick*, 91 Idaho 6, 10, 415 P.2d 48, 52 (1966)). Ultimately it is for the trier of fact to fix the amount by determining the credibility of the witnesses, resolving conflicts in the evidence, and drawing reasonable inferences therefrom. *Sells*, 141 Idaho at 774, 118 P.3d at 106 (quoting *Bumgarner*, 124 Idaho at 640, 862 P.2d at 332).

### 1. Increased cost of raising fish during years four and five.

Griffith presented testimony from its accountant, Dan Deagle, CPA, who had over twenty years of experience working with fish farmers and processors in the area. Deagle estimated the "increased cost" to raise fish by calculating the average cost per pound for years two and three, which he then used as a baseline against which he could compare year four and year five. Deagle excluded year one from the baseline calculation because he "did not have sufficient accounting information to make accurate comparisons with that year."

Deagle calculated a cost per pound of 50 cents in year two and 56 cents in year three, resulting in an average cost per pound of 53 cents, which he used as the baseline. He corroborated this number with a report by Rick Eggleston, a fish farm appraiser, who had concluded that the cost to raise fish at another farm in the area was 54.5 cents. The year four cost was 68 cents and year five was 84 cents. Multiplying the difference in cost by the number of pounds sold resulted in a damage estimate of $164,000 for year four and $271,000 for year five.

Clear Lakes asserts that no competent evidence was submitted show a causal connection between the increased costs and the length of time Griffith was required to hold the fish and that the baseline cost calculation was skewed because year one, in which Griffith's costs amounted to 95 cents per pound, was excluded, such that only the two lowest-cost years were relied upon.

### a. Causation.

 The burden is upon the plaintiff to prove not only that it was injured, but that its injury was the result of the defendant's breach; both amount and causation must be proven with reasonable certainty. *See Magic Valley Truck Brokers, Inc. v. Meyer*, 133 Idaho 110, 116, 982 P.2d 945, 951 (Ct.App. 1999); *cf. Gillingham Constr. v. Newby–Wiggins Constr., Inc.*, 142 Idaho 15, 26, 121 P.3d 946, 957 (2005) (upholding award of damages where plaintiff presented substantial evidence of causation). Clear Lakes asserts that Deagle never performed an analysis to tie the increased costs to any specific cause and that he failed to analyze a number of other variables that might contribute to variations in the costs, including changes in the number of employees or in their salary levels; changes in insurance rates; changes in the price of feed and fuel; specific items of repair and maintenance; and so forth. In the absence of any breach the cost increased by 6 cents between years two and three, but Deagle was unable to determine precisely why the cost went up during that period. According to Clear Lakes, such unexplained variations cast doubt on the assumption that

the increased costs during years four and five were caused by the breach.

The fact that Deagle did not analyze every potential alternative cause is not fatal to Griffith's claim. He testified, and the district court agreed, that one would expect expenses to go up when the fish are kept for longer periods of time. Griffith was required to feed and care for the fish even after they had reached market size, often placing them on maintenance feed designed to maintain weight rather than add it. Keeping the fish for a longer period of time without adding any weight increased the cost per pound of the fish produced. Rodney Griffith testified that it cost more for labor, feed, and fuel to keep the fish the extra time. The district court was entitled to draw reasonable inferences from the evidence. It determined that any increase in costs over the base years was more likely than not attributable to Clear Lakes' delays in taking delivery. The evidence was sufficient to justify the district court's inference of causation, and Clear Lakes presented no evidence to the contrary.

 Griffith claimed, and the district court apparently agreed, that Deagle's analysis was the only analysis that could be done under the circumstances. "The mere fact that it is difficult to arrive at exact amount of damages, where it is shown that damages resulted, does not mean that damages may not be awarded...." *Sells*, 141 Idaho at 774, 118 P.3d at 106 (quoting *Bumgarner*, 124 Idaho at 640, 862 P.2d at 332). "Compensatory damages ... have to be proved with whatever definiteness and accuracy the facts permit, but no more." I.C. § 28–1–106 cmt. 1. The district court noted that Deagle's analysis did not take account of every factor that might influence costs but found it was still sufficient to provide a reasonably certain estimate of the damages:

> Again, even considering Clear Lakes' dispute with Deagle's numbers, I determine that Deagle's numbers are realistic given the delays in harvest and the Griffiths' maintaining fish in the ponds for extended periods of time. Deagle's numbers are also more sensible when coupled with [the Griffiths'] testimony that they were suffer-

ing significant cash flow problems in 2003....

The district court's conclusion that Deagle's analysis went beyond speculation is supported by the evidence and is consistent with the principle that "the wrongdoer shall bear the risk of the uncertainty which his own wrong has created." *Smith v. Mitton*, 140 Idaho 893, 900, 104 P.3d 367, 374 (2004).

### b. Failure to include year one in the baseline calculation.

 According to Clear Lakes, if year one had been averaged in with years two and three the baseline cost would have been much higher, greatly reducing or even eliminating the damages claimed in years four and five. However, Deagle explained he was unable to produce a reliable cost estimate for year 1 because he lacked sufficient accounting information. The figure of 95 cents claimed by Clear Lakes to represent Griffith's year one costs apparently was taken from Deagle's spreadsheet but did not represent Deagle's opinion. It comes from applying the same formulas to the year one information as were applied to the other years, the difference being that the year one information was incomplete. Deagle testified that Griffith indicated there were other harvests during that year for which he (Deagle) had not received the records. Because he did not have an accurate amount of pounds of fish raised, he could not come up with an accurate cost-per-pound figure. Moreover, because he knew the figure for pounds raised was inaccurate he did not perform any more testing of the cash flow figures, and therefore the cash flow information was also erroneous. Deagle entered what information he had, but the resulting "cost" is meaningless. Clear Lakes presented no evidence of year one costs other than Deagle's estimate.

Regardless of whether the 95 cents figure claimed by Clear Lakes is valid, Clear Lakes claims the district court's conclusion was premised upon an incorrect assumption. Specifically, it argues, the district court thought Deagle's baseline cost of 53 cents was the average cost for the first three years of the contract, whereas year one had actually been excluded, and only the two lowest cost years had been used. Clear Lakes

points to the district court's statement in its Conclusions of Law that "Clear Lakes' breach damaged Griffiths financially by increasing their cost to produce fish from 53¢ per pound the first three years of the contract to 68¢ the fourth year and 84¢ the fifth year."

Contrary to Clear Lakes' argument, the record reflects that the district court knew where the baseline cost calculation came from. Several pages of the district court's Findings of Fact are devoted to discussing Deagle's cost figures for each year from year two to year five. The district court specifically recognized and rejected the adjustments proposed by Clear Lakes for years two and three and explained in detail the average cost calculation performed by Deagle. Its reference to "the first three years of the contract" is not inconsistent. Under Deagle's analysis, years two and three were intended to be representative of the entire pre-breach contractual period, including year one. The district court could reasonably find that the average of years two and three was representative of year one. Clear Lakes' allegation that Griffith purposely threw out the bad year goes to weight, not competence; the district court was entitled to believe Griffith. The district court's findings are supported by evidence.

### 2. Mortality losses during years four and five.

■ Clear Lakes' breach resulted in overcrowded conditions, reduced water quality, and increased frequency of harvests. Rodney Griffith testified that all of these conditions placed added stress on the fish and resulted in higher mortality losses than would have occurred with timely deliveries. Griffith historically experienced a mortality loss in the range of 1% to 2%. The year four mortality loss, however, was 8.78%, and year five was 7.2%. The district court noted, "Mr. Johnson agreed that Griffith was a good operator and raised a good product; nothing else in the record provides an alternative for these losses, other than the delays brought on by Clear Lakes." The district court awarded damages for lost profits due to increased mortality loss, calculated as the ex-

cess of actual mortality loss over the historical high level of 2%. The resulting damages totaled approximately $37,000.

Rodney Griffith testified that he was required to keep the fish off feed for two to three days before harvesting, which would cause fish to die or lose weight. The natural consequence of taking fish in smaller loads with greater frequency is to amplify the adverse effect on the fish. This observation is not speculation. He also testified that in overcrowded conditions the fish would become stressed and often quit eating. The district court was entitled to believe his testimony and draw reasonable inferences from it.

## VI.

## DAMAGES SHOULD HAVE BEEN AWARDED FOR YEARS SIX AND SEVEN

■ Griffith claims it should have been awarded damages for additional fish it could have raised during the last two years of the contract, maintaining that the probable per-pound profit was readily ascertainable since the cost had been established through Deagle's estimates and the price had been set under the contract. The district court found that any determination of how many fish would have been grown during the remaining years of the contract was too speculative to support an award of damages.

Griffith disputes the district court's finding that future volume was overly speculative, pointing to the fact that Deagle did produce an estimate of future profits based on the assumption that future volume would accord with the historical average. The decline in the market, among other factors, may have rendered the historical averages questionable for determining future quantities.

Griffith also makes the argument that the quantity is not uncertain as a matter of law where an output contract is involved. The contract required Clear Lakes to sell to Griffith enough trout to produce "up to two million pounds live weight for each year," which Clear Lakes was then obligated to purchase back at market size. Idaho Code

§ 28–2–306(1) dealing with output contracts provides the following:

> (1) A term which measures the quantity by the output of the seller or the requirements of the buyer means such actual output or requirements as may occur in good faith, except that no quantity unreasonably disproportionate to any stated estimate or in the absence of a stated estimate to any normal or otherwise comparable prior output or requirements may be tendered or demanded.

While damages may be difficult to determine it is clear that the Clear Lakes breach deprived Griffith of the opportunity to complete performance of the contact for the remaining years and that losses for those years occurred. Consequently that portion of the decision of the district court is vacated and the case remanded to determine damages for years six and seven.

### VII.

### ATTORNEY FEES

 Clear Lakes claims that Griffith was not the prevailing party below. The fact that they recovered less than they initially requested does not keep them from being a prevailing party. Clear Lakes' counterclaim does not change the outcome. The amounts recovered by Clear Lakes were offsets against the amounts that they were obligated to pay Griffith. Recognition of these amounts does not prevent Griffith from being a prevailing party. The district court's grant of attorney fees to Griffith under I.C. § 12–120(3) is affirmed.

As the prevailing party on appeal, Griffith is also entitled to reasonable attorney fees on appeal. I.C. § 12–120(3).

### VIII.

### CONCLUSION

The decision of the district court is affirmed in part and vacated in part as outlined in this decision. The case is remanded for the determination of damages for years six and seven of the contract. Griffith is awarded costs and attorney fees on appeal.

Justices TROUT, EISMANN, BURDICK and JONES concur.