IN THE SUPREME COURT OF THE STATE OF IDAHO

Docket No. 35751

| | | |
|---|---|---|
| DEBRA A. BORLEY, | ) | |
| | ) | |
| Plaintiff-Respondent-<br>Cross-Appellant, | ) | Boise, February 2010 Term |
| | ) | |
| v. | ) | 2010 Opinion No. 52 |
| | ) | |
| KEVIN D. SMITH, | ) | Filed:  May 11, 2010 |
| | ) | |
| Defendant-Appellant-<br>Cross-Respondent. | ) | Stephen W. Kenyon, Clerk |
| | ) | |
| _____ | ) | |

Appeal from the District Court of the Fourth Judicial District of the State of Idaho, Ada County.  The Honorable Cheri C. Copsey, District Judge; Honorable Terry R. McDaniel, Magistrate Judge.

The district court's decision is <u>affirmed</u> in part, <u>reversed</u> in part, and the case is <u>remanded</u> for proceedings consistent with this opinion.

Derek A. Pica, PLLC, Boise, for appellant. Derek A. Pica argued.

Cosho Humphrey, LLP, Boise, for respondent. Matthew R. Bohn argued.

_____

J. JONES, Justice.

Kevin D. Smith appeals the district court's decision concerning Debra A. Borley's motion to divide certain assets omitted from the distribution of the marital estate. We affirm in part, reverse in part, and remand the case for proceedings consistent with this opinion.

**I.**
**Facts and Procedural History**

Smith and Borley were married on August 1, 1988. Smith started working as a United Airlines (United) pilot in 1990. In 1992, United filed for bankruptcy protection. As a result, United pilots lost their Defined Benefits Retirement Plan (A Plan), but were otherwise compensated by insurance payments through the Pension Benefit Guaranty Corporation (PBGC) and certain convertible notes as follows:

1

> 7. <u>Convertible Notes</u>. In the event that the A Plan is terminated pursuant to 29 U.S.C. § 1341 or § 1342 following judicial approval of such termination, the Revised 2003 Pilot Agreement and the Plan of Reorganization shall provide for the issuance of $550 Million of UAL convertible notes . . . .

In order for United pilots to receive the convertible notes, they had to be qualified members of the A Plan on December 30, 2004, and be employed by United on February 1, 2006. In determining a pilot's share of the convertible notes, United took into account each pilot's age, years left to retirement (reached at age sixty), and seniority. Because Smith was a qualified member of the A Plan on December 30, 2004, and was still employed with United on February 1, 2006, he received $30,707.36 in convertible notes in February of 2006 and $25,229.84 in March of 2006.

Additionally, pursuant to a Revised 2003 Pilot Agreement, United pilots were to receive stock allocations. These stock allocations attempted to compensate pilots for the work rules, compensation, and work benefits that each pilot lost as a result of restructuring their collective bargaining agreement, which was to run from May 1, 2003, through December 31, 2009. To be eligible for the stock allocations, United pilots had to be employed by United on May 1, 2003, and to receive the stock allocations, they had to be employed by United on February 1, 2006. Because Smith was employed by United on May 1, 2003, and again on February 1, 2006, he received upwards of 2,022 shares of United stock in February of 2006 valued at approximately $27 per share.

Borley and Smith were divorced on September 22, 2005, pursuant to a Judgment and Decree of Divorce. The parties had entered into a Property Settlement Agreement, dated September 15, 2005, (Agreement) and a copy of the same was attached to the Decree. Neither the convertible notes nor the stock allocations were specifically provided for in the Agreement. However, the Agreement divided Smith's retirement benefits as follows:

> 4. **<u>DIVISION OF RETIREMENT BENEFITS</u>**. Husband has been employed by United Airlines and has a pension, either with United Airlines, or now with Pension Benefit Guarantee Association. Wife shall receive fifty percent (50%) of the benefit accumulated by Husband during the marriage to be set over to her pursuant to a Qualified Domestic Relations Order.

After the Decree was entered and the Agreement was approved by the magistrate court, Borley filed a "Motion to Divide Omitted Asset" in which she asked the court to divide both the convertible notes and the stock allocations obtained by Smith in February and March of 2006.

Smith filed an answer and, after numerous procedural maneuvers, the court decided that it would treat the case as one having been submitted on cross-motions for summary judgment. The court required the parties to agree on a set of stipulated facts, and determined that it would consider the parties' simultaneous briefs, affidavits, excerpts from depositions, and documents received through discovery. In Smith's memorandum in support of summary judgment, he argued that: (1) the magistrate court did not have jurisdiction to divide the assets because the Agreement was not merged into the Decree; (2) Borley's claim was barred by res judicata; (3) the convertible notes and stock allocations were his sole and separate property; and (4) the convertible notes and stock allocations were not omitted assets because they were provided for in the Agreement. In response, Borley argued that: (1) the Agreement was merged into the Decree; (2) the magistrate court had equitable jurisdiction to hear the claim; (3) the convertible notes and stock allocations were owned by the community; and (4) the convertible notes and stock allocations were omitted assets.

In its memorandum decision, the magistrate court held that: (1) it had jurisdiction over Borley's motion because the Agreement was merged into the Decree; (2) res judicata did not bar the action because the court had equitable jurisdiction; (3) the convertible notes were not omitted assets, but rather community property subject to division under Paragraph 4 of the Agreement to be calculated by the time rule method; and (4) the stock allocations were not omitted assets because they were known at the time of the execution of the Agreement and thus were Smith's sole and separate property. The magistrate court entered an order granting Borley's motion in part, denying it in part, and denying an award of attorney fees and costs.

Smith appealed the magistrate's order to the district court, and Borley cross-appealed the magistrate's decision on attorney fees and costs. The district court affirmed the magistrate's findings that: (1) the Agreement was merged into the Decree, providing the court with jurisdiction: (2) the court had equitable jurisdiction to modify the Decree; and (3) a portion of the convertible notes were community property subject to division under Paragraph 4 of the Agreement. However, the district court ruled that the magistrate court erred in applying the time rule method to the convertible notes, holding that the notes must be divided under the accrued benefit method. Additionally, the district court reversed the magistrate court's determination that the stock allocations were Smith's separate property, finding instead that the stock allocations were omitted community assets not covered by the terms of the Agreement. Lastly, the district

court ruled that neither party prevailed for purposes of attorney fees and costs. Smith then appealed to this Court, and Borley cross-appealed on the issue of attorney fees and costs.

## II.
### Issues Presented on Appeal

The following issues are presented on appeal: (1) whether the Agreement was merged into the Decree; (2) whether the magistrate court had jurisdiction to enforce the terms of the Agreement; (3) whether the community has an interest in the convertible notes or stock allocations; (4) whether any community interest in the convertible notes or stock allocations was divided under the Agreement; and (5) whether either party is entitled to attorney fees on appeal.

## III.
### A.
### Standard of Review

On appeal of a decision rendered by a district court acting in its appellate capacity, we directly review the district court's decision to determine whether it correctly decided the issues presented to it on appeal. *Idaho Dept. of Health and Welfare v. Doe*, 148 Idaho 124, 126, 219 P.3d 448, 450 (2009).

When this Court reviews a grant of summary judgment, it does so under the same standards employed by the district court. *Boise Tower Assocs. v. Hogland*, 147 Idaho 774, 779, 215 P.3d 494, 499 (2009). "The fact that the parties have filed cross-motions for summary judgment does not change the applicable standard of review, and this Court must evaluate each party's motion on its own merits." *Intermountain Forest Mgmt.*, *Inc.* v. *La. Pac. Corp.,* 136 Idaho 233, 235, 31 P.3d 921, 923 (2001). Summary judgment is proper "if the pleadings, depositions, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Idaho R. Civ. P. 56(c). Where the case will be tried without a jury, "the trial court as the trier of fact is entitled to arrive at the most probable inferences based upon the undisputed evidence properly before it and grant the summary judgment despite the possibility of conflicting inferences." *P.O. Ventures, Inc. v. Loucks Family Irrev. Trust*, 144 Idaho 233, 237, 159 P.3d 870, 874 (2007). This Court freely reviews the entire record that was before the district court to determine whether either side was entitled to judgment as a matter of law and whether inferences drawn by the district court are reasonably supported by the record. *Id.*

**B.**
**Merger**

Smith first argues that the magistrate court did not have jurisdiction over Borley's motion to divide any omitted assets because the Agreement was not merged into the Decree. Smith argues that the language of the Decree unambiguously demonstrates the parties' intent that the Agreement was not to be merged, thus leaving the court without jurisdiction to modify the Agreement. Borley, on the other hand, argues that when the language of the Agreement is read together with the language of the Decree, the intent of the parties regarding merger is unclear, and a presumption arises that the agreement is merged into the Decree. Consequently, she argues, the court has jurisdiction to divide any omitted assets.

A court has jurisdiction to modify the terms of a property settlement agreement only if the agreement is merged into the judgment and decree of divorce. *Roesbery v. Roesbery*, 88 Idaho 514, 521, 401 P.2d 805, 809 (1965). We have previously held that the question of merger or non-merger is determined by ascertaining the intent of the parties at the time of the divorce. *Compton v. Compton*, 101 Idaho 328, 332, 612 P.2d 1175, 1179 (1980). We hold that the Agreement was not merged into the Decree. In reaching this result, we expressly disaffirm the proposition that the parties' intent with respect to merger is established by looking at the language of *both* the decree of divorce and the property settlement agreement without first finding that the language in the decree is ambiguous. The proper analysis is to look first *only* to the four corners of the divorce decree. If the language of the decree clearly and unambiguously holds the property settlement agreement is not merged, the inquiry is at an end. The court's inquiry will move beyond the four corners of the decree to the property settlement agreement only when the decree is ambiguous and reasonably susceptible to conflicting interpretations.

An important principle drives this holding—private stipulations cannot circumvent court orders. Even when a contractual property settlement agreement is approved by a court, the court still retains the prerogative to accept or reject the merger of the property settlement agreement with the divorce decree. If the court's decree is unambiguous, but mistaken, with respect to merger, the parties have an inherent safeguard in the form of Idaho Rule of Civil Procedure

60(a), pursuant to which a party may request the court to correct a clerical mistake.[1] Idaho R. Civ. P. 60(a). With this protection already in place, there is no reason for a court to consider the language of a property settlement agreement when there is an unambiguous decree stating that the agreement is not merged. Neither party moved to correct the Decree here, so we must assume no mistake was made.

In this case, the Decree unambiguously states that the Agreement "is not merged nor incorporated" into the Decree. Because the magistrate court's holding with respect to merger is clear and unambiguous, this Court will give effect to it. Therefore, there was no merger in this case, and the Agreement did not become an operative part of the Decree. Consequently, the court was without jurisdiction to modify the terms of the Agreement.

## C.
### Jurisdiction to Enforce the Agreement

Smith contends that the magistrate court did not have jurisdiction to enforce the terms of the Agreement because (1) the Agreement was not merged into the Decree and (2) because the assets were divided pursuant to the terms of the Agreement. Smith is quite correct that once the Court determines the Agreement was not merged into the Decree, the court is without jurisdiction to *modify* the terms of the Agreement. In other words, "[i]n the absence of an appeal from an original decree of divorce the property divisions portions of that decree are final, *res judicata*, and no jurisdiction exists to modify property provisions of a divorce decree." *McBride v. McBride*, 112 Idaho 959, 961, 739 P.2d 258, 260 (1987)[2]. However, this is an entirely separate inquiry from whether the court has jurisdiction to *enforce* the terms of the Agreement.

In this case, Borley originally entitled her action as a "Motion to Divide Omitted Asset." However, it quickly became apparent from Borley's arguments in front of the magistrate court that she was arguing either (1) that the assets were omitted from the Agreement or (2) that the assets should have been divided pursuant to Section 4 of the Agreement. Thus, despite the fact that the motion was presented solely as a motion to divide an omitted asset, as in any civil case, a mislabeled claim may be treated according to its substance. *Carroll v. MBNA America Bank*, 148

---

[1] In should be noted that Borley was the party who drafted the Decree for the court to sign. Thus, it seems disingenuous for Borley to now claim that the very document she drafted is ambiguous and subject to an interpretation at odds with the language she wrote into the Decree.

[2] The *McBride* Court appears to indicate that a party to a property settlement agreement that is not merged may seek court enforcement where the other party has failed to carry out the terms of the agreement. *Id.* at 962, 739 P.2d at 261.

Idaho 261, 268, 220 P.3d 1080, 1087 (2009). Additionally, both the magistrate court and the district court, at least in part, analyzed the action as arising out of the contract between the parties. Neither Smith nor Borley objected to the magistrate's treatment of the case as arising out of the Agreement.

In its Decree, the magistrate court specifically approved the Agreement. It certainly had the jurisdiction to do so under Idaho Code section 32-713, which provides that the court, in rendering a decree of divorce, must make an appropriate order for the disposition of the community property. The court has the power under Idaho Code sections 1-1603 and 1-1901, to enforce its orders. In this case, because we find that the assets in question—the convertible notes and stock allocations—were community property at the time of the divorce and divided pursuant to the Agreement, the magistrate court had jurisdiction to interpret and enforce the terms of the Agreement. This case, like *Spencer,* does not involve the situation where assets were not encompassed within the order dividing the community property, necessitating the institution of the separate contract action, 115 Idaho at 344, 766 P.2d at 1225. Here, the thrust of the inquiry below was primarily directed toward interpreting the court-approved Agreement to determine whether the assets in question were divided therein. We have found that to be the case so there is no need for the parties to seek relief in a separate contract action.

## D.
## Status of the Notes and Stock

We next consider whether the parties had a community interest in the convertible notes and/or stock allocations and, if so, whether that community interest was divided under the terms of the Agreement. Smith argues that both the stock allocations and the convertible notes were awarded to him as his separate property under Paragraph 13 of the Agreement. Borley, on the other hand, argues that the convertible notes and stock allocations were community property to be shared equally between the parties under Paragraph 4 of the Agreement, or in the alternative, are omitted community assets that were unintentionally left undivided in the Agreement.

When considering the parties' arguments as to the convertible notes, the magistrate court held that the notes were not "an omitted asset, but rather [were] controlled by paragraph four [of the property settlement agreement] under the division of retirement benefit and specifically under amounts to be received from United Airlines." Thus, the magistrate court recognized that Borley

7

held a community interest in the notes, but that her interest was previously divided under Paragraph 4 of the Agreement. The district court affirmed, holding:

> The settlement agreement unambiguously provides that those retirement benefits accumulated during marriage are to be divided equally between the parties. The question is when the benefit of the convertible notes accumulated. The magistrate court correctly concluded that the convertible notes constituted benefits accumulated during the marriage.

With respect to the stock allocations, the magistrate court held:

> [I]t is clear to this court pursuant to the February 9, 2006 letter marked as Exhibit 3 to Matthew Bohn's affidavit of April 16, 2007 the income received from the sale of United stock was paid to the pilots because they gave up significant compensation pursuant to work rules, work benefits, and regular compensation to allow for United airlines to go through and exit bankruptcy.
>
> [I]t is clear from [Borley's] deposition taken on February 9, 2007 that she was well aware of United Airlines offers to compensate the pilots during the bankruptcy in order to resolve the restructuring issues facing United Airlines.
>
> [Borley] specifically testified that she understood that some time in the future the pilots of United Airlines including [Smith] could possibly be compensated for them having their retirement taking away and agreeing to pay cuts during the restructuring.
>
> [Borley] also testified that she was specifically aware of this possibility when she and [Smith] entered into the settlement agreement that is the subject of this litigation.
>
> Therefore, based on the stipulated facts and the deposition of [Borley] and United Airlines documents reviewed by this court, it is clear that the stock allocation would fall under paragraph 13 of the property settlement agreement and would be [Smith's] sole and separate property.

In reversing, the district court held:

> An examination of the stipulated facts reveals that the stock allocations were meant to compensate United Airlines' pilots for "the work rules, compensation, and work benefits that they lost as a result of restructuring their collective bargaining agreement, which is to run from May 1, 2003 through December 31, 2009." Presumably, a portion of the stock allocations received by Smith represented the loss of work rules, compensation, and work benefits suffered between May 1, 2003 and the date of the divorce. This portion is clearly community property not covered by the terms of the settlement agreement. As such, it is an omitted asset and must be divided equally between the parties.

8

Furthermore, Idaho courts have rejected Smith's argument that since vesting of the stock allocations was contingent upon his continued employment through February 1, 2006, the allocations constituted separate property. *Batra* [*v. Batra*, 135 Idaho at 388, 393, 17 P.3d 889, 894 (Ct. App. 2001)] (finding that stock options which vested after date of divorce were partially earned from the plaintiff-appellant's labor during marriage and, thus, the community had a fractional interest in the stock options vesting in the months following the divorce).

In order to determine the proper status of the convertible notes and stock allocations, we first consider whether a community interest existed in either or both at the time of the divorce. This inquiry is to be determined under established principles of Idaho community property law. If a community interest existed in either or both of those assets, we must then consider whether the Agreement divided that community interest between the parties. This inquiry is based on established principles of Idaho contract law.

## 1.
## Community Interest

Smith argues that, subject to Paragraph 13 of the Agreement, the only community property interest Borley could claim in the convertible notes or stock allocations is that which derives from any portion of the notes "accumulated or acquired" by the time of the parties' divorce. Paragraph 13 of the Agreement provides in pertinent part:

13. **SEPARATE PROPERTY/IMCOME AFTER SIGNING OF AGREEMENT**: The parties hereto stipulate and agree that from and after the date of the signing of this Agreement, any and all property or income acquired or earned by either party hereto shall be the separate property of the party who has acquired or earned it and the other party shall have no claim thereon.

Smith contends that because he did not acquire his interest until after the divorce was final, both the convertible notes and the stock allocations were his separate property pursuant to Paragraph 13.

Smith received $30,707.36 in convertible notes in February of 2006, and received another $25,229.84 in convertible notes in March of 2006. United pilots received these convertible notes as compensation for the loss of their A Plan, which was terminated pursuant to United's bankruptcy. Following United's bankruptcy, an agreement was reached wherein the pilots' collective bargaining agreement was modified by eliminating the pilots' A Plan but compensating active pilots with the PBGC insurance payments and proceeds from the sale of $550 million in convertible notes. In return, the Airline Pilots Association (ALPA) agreed not to

9

oppose United's termination of the existing A Plan. After certain retired pilots objected to the restructured agreement, the pilots' A Plan was involuntarily terminated by the bankruptcy judge effective as of December 30, 2004. The United Master Executive Council (United MEC) of the ALPA was charged with the duty of determining which pilots were eligible to share in the sale of the convertible notes and how much they would receive. The United MEC chose to allocate the proceeds from the sale of the convertible notes to compensate the pilots for losses suffered by the termination of their A Plan, including losses of past accruals and future expectations of what the pilots would have received under the A Plan. In a broader sense, the proceeds from the convertible notes were meant to offset the totality of the pilots' concessions in the bankruptcy exit agreement, including compensation for wage concessions, work rule concessions, and changes in benefits. However, it is uncontroverted, and in fact stipulated by the parties, that the notes were meant to compensate the pilots, at least in part, for the loss of their pension. Thus, the convertible notes compensated the pilots for both past and future losses that span the entire balance of an individual pilot's career.

Additionally, in February of 2006, Smith received upwards of 2,022 shares of United stock valued at approximately $27 per share. Following United's bankruptcy, the initial section 1113 agreement (the bankruptcy exit agreement) became effective on May 1, 2003, and was to run through December 31, 2009. Immediately following the bankruptcy, United reserved approximately 110 million shares of new United stock for general unsecured creditors. The ALPA allocated the stock to the pilots on a seniority basis. The stock allocations were meant to compensate the pilots for the pain and suffering they would endure[3] under the restructuring of their collective bargaining agreement that was to run from May 1, 2003, through December 31, 2009. Thus, the stock allocations did not compensate pilots for anything prior to May 1, 2003, but instead were meant to compensate the pilots for the 80-month window between May 1, 2003, and December 31, 2009. However, if Smith's employment would have been terminated after May 1, 2003, but before February 1, 2006, he would have received a prorated allocation of the stock.

Idaho law is clear that pension benefits and many other types of post-retirement payouts are a form of deferred compensation that an employee incrementally earns beginning at the first

---

[3] This encompasses changes in work rules, pilot compensation, and work benefits.

day of his or her employment. *See Shill v. Shill*, 100 Idaho 433, 436, 599 P.2d 1004, 1007 (1979). The right to acquire the benefits earned and accumulated day by day throughout the employment period may be contingent upon the completion of a predetermined number of employment years, and thus the rights earned and accumulated during the marriage vest at the moment the employer becomes obligated to pay those benefits. *Id.* An employee acquires a contingent property interest in the pension benefits from the moment he or she begins performance under the employment contract, and therefore, the benefits earned during marriage up to the date of divorce are a form of deferred compensation in which the nonemployee spouse has a community interest regardless of whether the pension is vested or nonvested. *Id.*

The record in this case demonstrates that at the time of divorce, Borley had a contingent community property interest in both the convertible notes and the stock allocations. Smith asks this Court to adopt the view that, because the convertible notes and stock allocations only vested post-divorce, the whole of the benefits attributable both to his employment during the marriage and his employment post-marriage are his separate property. This contention is incorrect and represents a misunderstanding of Idaho community property law.

With respect to the convertible notes, Smith began earning and accumulating his A Plan benefits on the first day of his employment on October 22, 1990. Because Smith and Borley were married at that time, the A Plan inured to the benefit of the community. Starting in 1990, both Borley and Smith received a contingent community property interest in the A Plan that continued to earn and accumulate during the marriage. While the A Plan would not vest until after the divorce, the benefits earned under the A Plan during the marriage up to the date of the divorce were a form of deferred compensation in which Borley had a community interest. When the convertible notes were issued to replace the A Plan, the community's interest in the A Plan was similarly replaced by the community's interest in the convertible notes. Smith is correct that the community's interest in the convertible notes was not to vest until February 1, 2006, five months after the divorce—however, Borley had a contingent community property interest in the convertible notes that began earning and accumulating on the first day of Smith's employment and continued to accumulate until the divorce was final.

Similarly with respect to the stock allocations,[4] Smith began earning and accumulating interest in the stock on the first day of the restructured collective bargaining agreement on May 1, 2003. Because Smith and Borley were married at that time, the contingent property interest inured to the benefit of the community even though the interest would not vest until February 1, 2006. Thus, Borley held a contingent property interest in the stock allocations between May 1, 2003, and the date of the divorce on September 22, 2005. Consequently, we hold that Borley had a community interest in both the convertible notes and the stock allocations outside the scope of Paragraph 13 of the Agreement.

## 2.
### The Property Settlement Agreement

Because we find that Borley held a community interest in the convertible notes and stock allocations, we must next determine whether the Agreement divided those interests.

### a.
### Convertible Notes

Both the magistrate court and the district court held that the convertible notes were governed by Paragraph 4 of the Agreement, but that the stock allocations were not. Paragraph 4 reads:

> 4.    **DIVISION OF RETIREMENT BENEFITS**. Husband has been employed by United Airlines and has a pension, either with United Airlines, or now with Pension Benefit Guarantee Association (sic). Wife shall receive fifty percent (50%) of the benefit accumulated by Husband during the marriage to be set over to her pursuant to a Qualified Domestic Relations Order.

The classification of the convertible notes is difficult and requires an extensive examination of the record. As noted previously, United entered into bankruptcy proceedings in 2002. In those bankruptcy proceedings, United attempted to renegotiate the then-existing collective bargaining agreement between United and its pilots. The product of those negotiations was a bankruptcy exit agreement. Central to this case, in consideration for the ALPA's agreement not to oppose the bankruptcy exit agreement, United provided for $550 million worth

---

[4] Smith argues that the district court's citation of *Batra v. Batra*, 135 Idaho 388, 17 P.3d 889 (Ct. App. 2001), which outlines the general community property principles for deferred compensation set forth above, was misplaced because *Batra* dealt with flights (separately vesting segments) of stock options, while the case at bar deals with stock allocations that are not subject to vesting rules. Smith cites no authority for the proposition that stock allocations are not subject to the same rules of community property that govern other types of deferred compensation.

of convertible subordinated notes to be issued to the ALPA not later than six months after United exited from the bankruptcy.

One of the pilots' concessions within the bankruptcy exit agreement was the termination of their A Plan. However, the convertible notes were not the pilots' only compensation for the loss of the A Plan. When the A Plan was terminated, United took all its assets on hand on the date of the plan termination and allocated them to pay the benefits under the A Plan in accordance with a statutory priority structure for unsecured creditors in bankruptcy. The pilots were divided into six categories, with each pilot in the first category receiving full compensation before any pilot in the second category would receive any compensation. If United assets were insufficient to fund each category, the PBGC was required to step in and contribute to the total. The PBGC paid approximately $900 million to $1 billion in benefits following the United bankruptcy. Smith was assigned to category four, meaning that each pilot in category one, two, and three was fully compensated before he was entitled to any compensation. United's assets were sufficient to fund all of category one, all of category two, and approximately 80 percent of category three. Consequently, Smith did not receive any compensation from the sale of United assets, but was entirely dependent on the PBGC insurance system to recover any portion of his lost benefits. In other words, Smith's pension benefit was paid solely out of the PBGC insurance system. However, Smith was only entitled to the PBGC maximum estimated guarantee, which paid significantly less than the benefits he would have received had the A Plan remained in effect throughout the duration of his employment. Additionally, the pilots were compensated for the loss of their A Plan through the creation of the pilots' defined-contribution pension plan, otherwise known as the pilot-directed account plan (PDAP).

As noted, the ALPA received the convertible notes from United as compensation for the totality of the pilots' concessions in the bankruptcy exit agreement. These concessions not only included the termination of the pilots' A Plan, but also included wage concessions and significant work rule changes. The ALPA had the responsibility to decide how to allocate the notes among the pilots. The ALPA then chose to allocate convertible notes in a way that took the termination of the pilots' A Plan into account. Accordingly, Smith received compensation from three different sources related to ALPA's agreement not to oppose the restructured bankruptcy exit agreement: (1) the PBGC insurance payments; (2) the creation of the PDAP pension from United; and (3) the convertible notes from the ALPA.

13

We hold that the convertible notes were contemplated by Paragraph 4 of the Agreement. As mentioned above, it is uncontroverted, and in fact stipulated by the parties, that the notes were meant to compensate the pilots, at least in part, for the loss of their pension. Specifically, stipulated fact number thirteen indicates that the parties agreed that "the 'convertible notes' received by [the] pilots represented consideration for the loss of their 'A Plan.'" Thus, the district court was correct to affirm the magistrate court's decision that the notes were not "an omitted asset, but rather [were] controlled by paragraph four [of the property settlement agreement] under the division of retirement benefit and specifically under amounts to be received from United Airlines." When community property is exchanged for another asset, that asset becomes community property. Consequently, we hold that the convertible notes were divided pursuant to Paragraph 4 of the Agreement.

**b.**
**Stock Allocations**

The magistrate court held that the stock allocations were known at the time of the execution of the Agreement and thus were awarded to Smith as his sole and separate property under Paragraph 13 of the Agreement. Paragraph 13 reads:

> **13.** **SEPARATE PROPERTY/IMCOME AFTER SIGNING OF AGREEMENT**: The parties hereto stipulate and agree that from and after the date of the signing of this Agreement, any and all property or income acquired or earned by either party hereto shall be the separate property of the party who has acquired or earned it and the other party shall have no claim thereon.

As noted previously, the magistrate court erroneously predicated its determination that the stock allocations were divided pursuant to Paragraph 13 upon the belief that Borley did not have a community interest in stock allocations. The district court disagreed, and held that the stock allocations were omitted assets undivided by the Agreement.

We agree with the magistrate court, and hold that the stock allocations were divided pursuant to Paragraph 13 of the Agreement. Pursuant to Paragraph 13, the Wife explicitly agreed that from and after the date the Agreement was signed, any property acquired or earned by the other was to be the separate property of the party who acquired or earned it. It is undisputed that Smith held a contingent property interest in the stock allocations at the date of the divorce on September 22, 2005. Furthermore, Borley agreed pursuant to Paragraph 3 of the Agreement that any property under the control or in the possession of Smith at the time of the divorce, which,

14

like the stock allocations, was not specifically referenced in the Property and Debt Schedule of the Agreement, was Smith's separate property. We agree with the magistrate court that Borley was aware of United's offer to compensate the pilots through the stock allocations. As the magistrate court found,

> [Borley] specifically testified that she understood that some time in the future the pilots of United Airlines including [Smith] could possibly be compensated for them having their retirement taken away and agreeing to pay cuts during the restructuring.

> [Borley] also testified that she was specifically aware of this possibility when she and [Smith] entered into the settlement agreement that is the subject of this litigation.

We agree with the magistrate court that Borley was fully aware that she was entitled to some future compensation by means of the stock allocations at the time the Agreement was executed. With this knowledge, she signed the Agreement waiving her right to any and all property in Smith's possession or under Smith's control that was not specifically awarded in the Property and Debt Schedule. It does not matter that all the beneficial interests in the stock allocations were contingent at the time of the divorce, as those interests were still subject to a certain amount of control by Smith. Therefore, by the operative language of Paragraph 3 of the Agreement, Borley conveyed her interest in the stock allocations to Smith as his sole and separate property.

**E.**
**Division of the Convertible Notes**

Because the magistrate court has jurisdiction to enforce the terms of the Agreement, the remaining question is the proper manner in which the court should have divided the convertible notes. Smith argues that pursuant to Paragraph 4 of the Agreement, the parties agreed to divide the notes pursuant to the "accrued benefit" method. Borley, on the other hand, argues that the magistrate and district courts properly divided the assets pursuant to the "time rule" formula.

The method employed to divide community property is left to the sound discretion of the trial court and will not be disturbed unless the court abused that discretion. *See Stewart v. Stewart*, 143 Idaho 673, 677, 152 P.3d 544, 548 (2007). Review of the lower court's exercise of discretion requires a three-tiered inquiry: (1) whether the lower court rightly perceived the issue as one of discretion; (2) whether the court acted within the outer boundaries of such discretion and consistently with any legal standards applicable to specific choices; and (3) whether the

15

court reached its decision by an exercise of reason. *Id*. If the magistrate court properly exercised its discretion and the district court affirmed the magistrate court's decision, we will affirm the district court's decision as a matter of procedure. *See id.*

In its memorandum decision, the magistrate court determined that if Paragraph 4 did not govern the convertible notes, Borley's interest in the convertible notes was to be calculated by "multiplying the amount of the distribution by the fraction of [Smith's] age at the date of divorce over 60 (the age for mandatory retirement). Thereafter, the resulting fractional share would then be divided by 50% to achieve the community distribution to [Borley]." On appeal, the district court held that the convertible notes were governed by Paragraph 4 of the Agreement and should be divided pursuant to the accrued benefit method.

While, pursuant to Part III(D)(2)(a) of this opinion, we believe that Paragraph 4 governs the distribution of the convertible notes, we do not believe that Paragraph 4 indicates the method by which the court must divide the notes. While Paragraph 4 indicates that the "Wife shall receive fifty percent (50%) of the benefit accumulated by Husband during the marriage," this language does not indicate the method by which the court must determine the amount of Borley's fifty-percent interest. Thus, the magistrate court's division of the assets must be conducted pursuant to Idaho Code section 32-712(1), which provides:

> 1. The community property must be assigned by the court in such proportions as the court, from all the facts of the case and the condition of the parties, deems just, with due consideration of the following factors:
>
> (a) Unless there are compelling reasons otherwise, there shall be a substantially equal division in value, considering debts, between the spouses.
>
> (b) Factors which may bear upon whether a division shall be equal, or the manner of division, include, but are not limited to:
>
> (1) Duration of the marriage;
>
> (2) Any antenuptial agreement of the parties; provided, however, that the court shall have no authority to amend or rescind any such agreement;
>
> (3) The age, health, occupation, amount and source of income, vocational skills, employability, and liabilities of each spouse;
>
> (4) The needs of each spouse;
>
> (5) Whether the apportionment is in lieu of or in addition to maintenance;

(6) The present and potential earning capability of each party; and

(7) Retirement benefits, including, but not limited to, social security, civil service, military and railroad retirement benefits.

I.C. § 32-712.

This Court has determined that there are two possible methods for dividing a pension plan. The "lump sum method" or "net present value method" results in an imminent distribution to the non-employee spouse, whereby the court awards the employee spouse the pension and awards the non-employee spouse assets worth the net present value of the contingent benefits. *Hunt v. Hunt*, 137 Idaho 18, 20–21, 43 P.3d 777, 779–80 (2002). "The other method of dividing the rights is to reserve jurisdiction until retirement and divide the actual monetary benefit when received, also known as the 'as if, and when' or reserved jurisdiction method." *Id.* at 21, 43 P.3d at 790 (quoting *Shill v. Shill*, 100 Idaho 433, 437, 599 P.2d 1004 (1979)). This Court has held that the lump sum method is the preferred method of division. *Hunt*, 137 Idaho at 21, 43 P.3d at 790.

Using either the lump sum method or the reserved jurisdiction method requires a court to devise a formula by which to apportion the pension benefits. This Court has determined that there are two different methods for apportioning the benefits: the accrued benefit method and the time rule method. *Balderson v. Balderson*, 127 Idaho 48, 52, 896 P.2d 956, 960 (1995). "The accrued benefit method values the community interest as one-half of the difference between the value of the retirement account at the date of divorce and the value at the date of marriage." *Hunt v. Hunt*, 137 Idaho 18, 21, 43 P.3d 777, 780 (2002). Conversely, "[t]he time rule values the community interest in the retirement benefits as one-half of the fraction of the years of the community service under the plan, divided by the total years of service." *Id.*

In this case, the magistrate court, and then the district court, erred by failing to perceive the issue of valuation of the convertible notes and stock allocations as one of discretion. The decision between the lump sum method and the retained jurisdiction method is immaterial in this case, as Smith had received the benefits from the convertible notes at the time the magistrate court was conducting its analysis. However, because Paragraph 4 does not govern the method of valuing Borley's interest, the magistrate court had the option of valuing the assets under either the time rule method or the accrued benefit method. Neither the magistrate court nor the district

17

court correctly perceived the issue of valuation as one of discretion, and therefore, the district court abused its discretion. Instead, the lower court had the duty to utilize its discretion pursuant to Idaho Code section 32-712 in order to find the most equitable method of valuing the community's contribution to the convertible notes.

To value Borley's interest in the convertible notes, the magistrate court must determine which portion of the notes were earned before September 22, 2005, and then grant both Borley and Smith a fifty-percent interest pursuant to Paragraph 4. However, it should be noted that the formula articulated previously by the magistrate court is patently wrong. As noted above, the magistrate court calculated Borley's interest in the convertible notes by "multiplying the amount of the distribution by the fraction of [Smith's] age at the date of divorce over 60 (the age for mandatory retirement). Thereafter, the resulting fractional share would then be divided by 50% to achieve the community distribution to [Borley]." Under this erroneous formula, Borley started to obtain a community interest in the convertible notes at the moment of Smith's conception. If the magistrate court determines that the most equitable method of determining Borley's interest in the convertible notes is the time rule method, the proper formula is as follows. The time rule method includes a marital fraction, which determines the community interest in the pensions. The marital fraction consists of the numerator, which is the number of years (or months if more accurate) that the employee spouse has earned towards the pension during the marriage, over the denominator, which is the total number of years (or months) of total service towards the pension. The marital fraction is then multiplied times the total distribution of the pension (if known), and then divided in half.

It should also be noted that there is a possibility that a substantial majority of the convertible note allocation may be attributable to post-marital time. When this is the case, there is some dispute as to whether the time rule method is appropriate, which would necessarily include certain post-divorce enhancements in the community value of the notes. However, this Court, in *Hunt v. Hunt*, approved the use of the time rule method when valuing retirement or pension benefits at the date of retirement. 137 Idaho at 22, 43 P.3d at 781. Thus, this Court has implicitly acknowledged, in both the *Hunt* decision and in authorizing trial courts to utilize the retained jurisdiction method, that a trial court does not abuse its discretion when it allocates post-divorce enhancements in the value of the pension to the community. In other words, Idaho has implicitly recognized that "[t]he employee spouse's ability to enhance the future benefit after the

18

marriage frequently builds on foundation work and efforts undertaken during the marriage." *In re Marriage of Hunt*, 909 P.2d 525, 534 (Colo. 1995). This finding is in accord with many other jurisdictions. *See, e.g.*, *In re Marriage of Adams,* 134 Cal. Rptr. 298, 302 (Cal. Ct. App. 1976) (holding that "[t]wo of the factors causing the increase, namely 'time on the job' and increased earnings, were directly enhanced by the many years credited to the marriage"); *Stoerkel v. Stoerkel,* 711 S.W.2d 594, 597 (Mo. Ct. App. 1986) (holding that "increased benefits arise in part from the service performed during the marriage and for that reason it is proper to make the award on the basis of the total amount which [the employee spouse] would receive at the time such benefits commence"); *Gemma v. Gemma,* 778 P.2d 429, 431 (Nev. 1989) (noting that "early working periods are the building blocks to upward mobility and hopefully an increased salary" and "[w]hile no method is perfect, the advantages of the 'time rule' clearly outweigh any other method of pension division" ); *Bulicek v. Bulicek* 800 P.2d 394, 399 (Wash. Ct. App. 1990) (holding that "the prospective increase in retirement benefits due to increased pay after separation is founded on the [length of the marriage] years of community effort"). Thus, the magistrate court will necessarily face the question of whether it would be more equitable for Borley to receive a fifty-percent benefit from Smith's convertible notes on the basis of the amount the community would have been entitled to on the date of the divorce or, alternatively, based on the amount the community would have been entitled to on the date the convertible notes were received.

Additionally, it also should be noted that should the magistrate court decide that it is more equitable to divide the convertible notes by the accrued benefit method, the exact computation of Borley's interest may be difficult, as the lawyer for the ALPA testified:

> There certainly is a way to figure . . . out [what portion of the convertible notes would be post September 22, 2005]. It would necessitate involving an actuary. And if you were going to try and calculate this, here is what you would have to do.

> As of the date of plan termination, there would have been a loss probably based on the plan termination insurance provision which the two parties would effectively share 50/50, and that loss, whatever it was, is a part of the total loss that is included in the allocation process. Pretty small. And the balance of [Smith's] losses are measured by future events, starting from December 31, 2004. So including roughly a year of their marriage and extending out 16 years.

And, you know, when lawyers figure, they are likely to do it in a simplistic way. If you are going to do it accurately, what you have to do is replicate the projection of [Smith's] entitlement, which is something that probably exists somewhere. The ALPA actuaries may have it. And the reason I say that is because the way benefits accrue under the old A Plan is they accrue by a formula, years of service, times final average compensation, and final average compensation under the United plan, and subject to doing some checking, which I haven't done, the best 60 consecutive months of pay out of the last 120.

This is an ensnarled way of saying this, but I don't think you can treat the lost future accruals, which the note allocation mainly represents, as having occurred levelly over the last 16 years of [Smith's] career.

I believe that what would happen is there would be some back-loading of the entitlement based on compensation that he's not going to be earning until he hits 747 or 777 captaincy out in the last three or four years of his career, that that would drive the compensation, which will become his final average earnings.

And how you guys in your divorce world would take that into account, I have not a clue, but what we were doing to focus on these lost future expectations is bearing in mind that the benefit formula was a percentage, 1.41 percent, times years of service, times compensation. Then you are accruing an additional 1.41 percent of your final earnings each year, that is true, and maybe that's what you focus on, but the final average earnings itself is not determined until out at the end of the day, and the calculation that was involved was a calculation that attempted to predict approximately when [Smith] would be able to move from the airbus into a higher-paying piece of equipment and then follow his salary upward as it headed upward in that piece of equipment.

You would come through that piece of equipment as a first officer, then move over to the left seat, the captain, and that would result in a bump in compensation. And all of that, the progression of that advance in compensation affects the flow of contributions. The C Plan contributions for the PDAP and the timing of the receipt of those contributions by the PDAP affects the projected value based on future investment earnings.

And so you've got this whole stream of projections that come into play, and some portion of the—well, I'd leave it at that.

As this testimony depicts, the magistrate court may need to conduct some extensive fact-finding in order to accurately compute Borley's community interest in the convertible notes.

Accordingly, we remand the case for a determination of the most equitable method of valuing the community's interest in the convertible notes consistent with the above recommendations.

## E.
## Attorney Fees

Smith contends that he should be awarded his attorney fees and costs pursuant to Idaho Appellate Rules 40 and 41 and Paragraph 15.03 of the Agreement which states:

> **15.03.** If an action is instituted to enforce any of the terms of this Agreement, then the losing party agrees to pay to the prevailing party all costs and attorney fees incurred in that action.

Borley similarly contends that she should be awarded her attorney fees and costs pursuant to Idaho Appellate Rules 35(a)(5), 40, and 41 and Paragraph 15.03.

In order to be entitled to attorney fees on appeal, authority and argument establishing a right to fees must be presented in the first brief filed by a party with this Court. Idaho App. R. 36(b)(5), 41; *Goldman v. Graham*, 139 Idaho 945, 947–48, 88 P.3d 764, 766–67 (2004). A citation to statutes and rules authorizing fees, without more, is insufficient. *Goldman*, 139 Idaho at 947–48, 88 P.3d at 766–67. Although both parties cite to the Idaho Appellate Rules, they submit no argument in their briefs as to why fees should be awarded under any statute or contract provision. Thus, we decline to award attorney fees to either party on appeal.

## IV.
## Conclusion

For the above reasons, the district court's decision on review of the magistrate court's ruling is affirmed in part and reversed in part. We remand the case for proceedings consistent with this opinion. We decline to award attorney fees or costs on appeal.

Chief Justice EISMANN, and Justices BURDICK, W. JONES, and HORTON CONCUR.