# IN THE SUPREME COURT OF THE STATE OF IDAHO

## Docket Nos. 50471 / 50472

BRENDA VON WANDRUSZKA and RAY VON WANDRUSZKA, Husband and Wife; and ROBERT R. DAVIS,

    Plaintiffs-Respondents,

v.

CITY OF MOSCOW, WILLIAM LAMBERT, in his official capacity as Mayor of the City of Moscow; and SARAH L. BANKS, in her official capacity as Finance Director for the City of Moscow,

    Defendants-Appellants.

_____

BRENDA VON WANDRUSZKA and RAY VON WANDRUSZKA, Husband and Wife; and ROBERT R. DAVIS,

    Plaintiffs-Appellants,

v.

CITY OF MOSCOW, WILLIAM LAMBERT, in his official capacity as Mayor of the City of Moscow; and SARAH L. BANKS, in her official capacity as Finance Director for the City of Moscow,

    Defendants-Respondents.

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

Moscow, April 2024 Term

Opinion filed: August 19, 2024

Melanie Gagnepain, Clerk

Consolidated appeals from the District Court of the Second Judicial District of the State of Idaho, Latah County. Jay P. Gaskill, District Judge.

The judgments of the district court are <u>affirmed in part</u>, <u>reversed in part</u>, and <u>remanded</u>.

Clements, Brown & McNichols, P.A., Lewiston, for Appellants City of Moscow, William Lambert and Sarah Banks in Docket No. 50471 and Respondents in Docket No. 50472. Andrew Pluskal argued.

1

Clark & Feeney, LLP, Lewiston for Respondents Brenda Von Wandruszka, Ray Von Wandruszka and Robert Davis in Docket No. 50471 and Appellants in Docket No. 50472. William Jeremy Carr argued.

Naylor & Hales, Boise, for Amicus City of Idaho City and International Municipal Lawyers Association.

---

MOELLER, Justice.

In this consolidated appeal, we are tasked with reviewing the City of Moscow's (the "City") revised utility billing process for water service. Brenda and Ray von Wandruszka, along with their business partner, Robert R. Davis (the "Plaintiffs"), are property owners who owned personal residences as well as rental properties located within the City's limits. The Plaintiffs filed a lawsuit against the City following the adoption of a city resolution in 2021. In a letter sent to all property owners, the City informed the Plaintiffs that if they did not sign the contract, they would lose water services to their properties. The Plaintiffs signed under protest and then alleged in their petition that they were forced to sign the contracts with the City, by which they essentially agreed to become guarantors for their tenants' unpaid water bills. The Plaintiffs claim that these were unenforceable adhesion contracts signed under duress, while the City contends it was lawfully requiring property owners to guarantee payment for water services provided to the owners' property, regardless of whether it is occupied by the owner or a tenant.

After cross-motions for summary judgment were filed, the district court agreed with the Plaintiffs that the City was not authorized to recover a tenant's unpaid utility charges from a property owner. However, the district court also ruled that the City was authorized to require owner-occupied properties to enter into an agreement to pay for the water they actually consume. Both parties have appealed the split summary judgment awards. For the following reasons, we affirm in part and reverse in part.

## I. FACTUAL AND PROCEDURAL BACKGROUND

The Plaintiffs own several properties within the city limits of Moscow, Idaho, consisting of their personal residences and rental properties leased to a variety of tenants, both residential and commercial. The commercial tenants include a hydrology firm, an ultrasound technician, physical therapists, and a medical spa. Their residential tenants include professors, college students, entrepreneurs, bankers, and retired individuals. During the times relevant to this proceeding, all of

2

the Plaintiffs' tenants and properties were current on their utility bills, and there is no evidence of delinquent payments in the record.

The Plaintiffs' water is provided by the City of Moscow, which operates a public water system. It is the only provider of water services within the city limits. The City administers utility billing processes for supplying water to its customers, which include billing, collection, and the enforcement of its policies and regulations. Until 2021, initiating utility service was an informal process; anyone—either an owner or a tenant—could call the City's finance department to open a utility account and activate utility services at a specific property. However, the City's finance director reported that landlord-tenant accounts created considerable challenges. While unpaid utility bills were ultimately the responsibility of the property owner under the then-existing city code, the City reported that it received "push back" from property owners relying on *City of Grangeville v. Haskin*, 116 Idaho 535, 777 P.2d 1208 (1989), whenever it attempted to collect a tenant's unpaid balance from the property owner. As a result, the City estimated that it lost $40,000 per year to delinquent accounts. In 2021, past due utilities skyrocketed to $143,054.[1]

To address the issue of unpaid balances from rental properties, the Moscow City Council revised its utility contracting process by adopting Resolution 2021-01 (hereinafter, the "Resolution"). The Resolution contained the following recitations:

> WHEREAS, the Mayor and [City] Council have an interest in promoting the health, safety and the general welfare of all citizens of the City of Moscow; and
>
> . . . .
>
> WHEREAS, the City's current practice of utility billing has resulted in challenges in collection of unpaid balances from property owners when a tenant fails to pay their utility bills and the City resources being spent to collect on these unpaid accounts has led to the recommended revised billing process as reflected in the attached exhibits; and
>
> WHEREAS, the proposed changes to the City's utility billing process is to address the deficiencies in the current process for collection of past due accounts and to better utilize the City's resources, ensure services being provided by the City are being paid by the property owner, and to provide a legally defensible method for the City to collect fees owed.
>
> NOW, THEREFORE, BE IT RESOLVED . . . [t]he [utility billing policy, utility billing application, and utility billing directive] are the approved regulations for all utility billing collection and enforcement[.]

---

[1] The Plaintiffs' amended complaint suggests that these large unpaid balances resulted at least in part from "people leaving town during the Covid shutdown."

Under this revised billing process, a tenant can no longer directly contact the City to start water services; only a property owner may initiate a utility hook up. The Resolution provided that current utility account holders had to complete a new billing application form by a set deadline for the use of utility services, regardless of their current contracts or payment history. The billing application form

> provided the City with updated contact information about the property owner, explained that this application was a formal request of the property owner requesting services for city utilities at a specific address, and provided an acknowledgment from the property owner tha[t] they will remain legally responsible and liable for unpaid account balances against the service address, regardless of who uses the service.

The form also specified that the failure to pay delinquent balances may result in utility services being shut off and imposing a property lien against the owner's real property. It stated:

> ANY UNPAID BALANCES ARE THE RESPONSIBILITY OF THE PROPERTY OWNER. SERVICES MAY BE DISCONTINUED FOR NON-PAYMENT AND WILL NOT BE REACTIVATED UNTIL THE UNPAID BALANCE IS PAID IN FULL. LIENS MAY BE PLACED ON THE PROPERTY FOR NON-PAYMENT.

Notice of the revised billing policy was provided to property owners in Moscow over a nine-month period through newsletters and letters. Letters first went out in March of 2021, explaining the new Resolution and that a property owner agreement must be signed and returned to the City. Additionally, the letter stated that failing to comply by December 15, 2021, would result in water being shut off to the owners' properties the following day.

By December 3, 2021, the Plaintiffs had not submitted new billing applications for any of their properties. According to the Plaintiffs, on that day, Brenda received a phone call from the city attorney advising her "that the City would shut off water to all of the Plaintiffs' properties, including their personal residence," on December 15 "if they did not sign and return one of the agreements." On December 10, the Plaintiffs filed a complaint for expedited declaratory judgment and preliminary injunctive relief against the City, arguing that the City cannot terminate or modify agreements with tenants and property owners who have no outstanding debts for services. Although the Plaintiffs had not yet submitted a utility services application form as required by the new policy, they did so on December 14. When the Plaintiffs signed the agreements, they noted that they were signing under duress due to the threat that they would lose water services at all of

4

their properties. As a result of signing the agreements, the Plaintiffs' water was not shut off at any of their personal or rental properties.

After signing the agreements, the Plaintiffs amended their complaint with the district court's permission to include a claim of duress. The parties then filed cross-motions for summary judgment on the issue of whether the City could "induce property owners to enter into a contract which allows the City to terminate and refuse water service not only at the address at which bills accrue, but also all other properties owned by the same landlord."

The district court ultimately granted summary judgment in part, and denied it in part, to each party. The district court first concluded that the Plaintiffs established that they signed the utility billing agreements under economic duress. This determination was based on the facts that the Plaintiffs had no alternative way to provide water to their properties and tenants, and their water was going to be turned off the next day unless they signed the agreements. In connection with this ruling, the district court concluded that Idaho Code sections 50-323 and 50-1030(f) "do not give the City implied power to collect from the owner for charges incurred by the tenants." Thus, the court concluded that the City's revised policy and new contracts were an unlawful circumvention of *City of Grangeville v. Haskin*, 116 Idaho 535, 777 P.2d 1208 (1989), in which this Court "held that a city was not statutorily authorized to recover tenants' unpaid utility charges from the property owner." The district court also concluded that (1) it was unreasonable for the City to force property owners to sign a contract for continued water service under duress because water is a necessity for habitability, and (2) the contractual lien provisions in the agreements are unconscionable and against public policy. The remaining issue concerning violation of Idaho's Consumer Protection Act, I.C. § 48-603C(1), was never reached by the district court because it concluded it was unnecessary to the decision.

As summarized by the district court, in *City of Grangeville*, this Court determined that a city is not authorized to recover a tenant's unpaid utility charges from a property owner. Therefore, the Plaintiffs were entitled to summary judgment with respect to the contested utility billing agreements governing their rental properties. However, because the City was authorized to require owner-occupied properties to enter an agreement to pay for the water that the property owner actually consumes, the City's motion for summary judgment was granted as to the agreements concerning owner-occupied properties. Thus, the district court granted summary judgment in part and denied it in part.

5

Both the City and the Plaintiffs appealed. The City's appeal is based on the district court's determinations that the billing agreements the Plaintiffs signed: (1) violated *City of Grangeville*; (2) were signed under duress; and (3) were void as against public policy. The Plaintiffs' appeal centers on the district court's decision that the City could require property owners to sign the utility billing agreements for owner-occupied properties, asserting that the lien provisions in the agreements were unclear and unauthorized. On August 18, 2023, this Court consolidated the appeals. This Court also granted a motion by the Association of Idaho Cities, City of New Meadows, City of Idaho City, and the International Municipal Lawyers Association (collectively, "the Amici") to file an amicus curiae brief.

## II. STANDARDS OF REVIEW

When this Court reviews a trial court's ruling on a motion for summary judgment, we apply the same standard used by the trial court in ruling on the motion. *Krinitt v. Idaho Dep't of Fish & Game*, 162 Idaho 425, 428, 398 P.3d 158, 161 (2017) (citation omitted). Summary judgment is awarded "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." I.R.C.P. 56(a). This Court liberally construes all disputed facts, and draws all reasonable inferences in the record, in the light most favorable to the party opposing the motion. *Bradbury v. City of Lewiston*, 172 Idaho 393, 402, 533 P.3d 606, 615 (2023). Where there are no disputed issues of material fact, only a question of law remains, which this Court freely reviews. *Id.*

Where the parties file cross-motions for summary judgment, the standard of review remains the same. *Borley v. Smith*, 149 Idaho 171, 176, 233 P.3d 102, 107 (2010) (citation omitted). We evaluate "each party's motion on its own merits." *Id.*

## III. ANALYSIS

### A. The Plaintiffs have standing because they have alleged a distinct and palpable injury.

Before addressing the merits of these consolidated appeals, we must first address a question of justiciability. The Plaintiffs' standing to initiate this action was never challenged by the City before the district court. However, the City now argues on appeal that the Plaintiffs are making "an inappropriate request for an advisory opinion" because they (1) lack an actual injury or controversy and (2) are barred by the taxpayer standing rule. More specifically, the City argues that the Plaintiffs lack standing because they allege only a hypothetical injury because "no delinquent bills" exist and the Plaintiffs' water service was never terminated. In response, the

6

Plaintiffs contend that they suffered a particularized injury because they were "forced and unlawfully coerced" into signing the utility billing agreements, which required them to grant a contractual lien right to the City. Additionally, while the Plaintiffs recognize that the Resolution affected a large class of individuals, they argue that this "is a specialized and peculiar injury" because it does not impact every resident or taxpayer of either the City of Moscow or Idaho.

Standing is a jurisdictional issue that may be raised at any time. *Koch v. Canyon Cnty.*, 145 Idaho 158, 162, 177 P.3d 372, 376 (2008). It "is a threshold determination by this Court before reaching the merits of the case." *Reclaim Idaho v. Denney*, 169 Idaho 406, 418, 497 P.3d 160, 172 (2021). The standing inquiry focuses on the party seeking relief rather than the issues the party wishes to have adjudicated. *Id.* (citation omitted). Because Idaho's Constitution lacks an analogous "case or controversy" provision as exists in the United States Constitution, Idaho's standing rule is a "self-imposed constraint adopted from federal practice." *Id.* (quoting *Regan v. Denney*, 165 Idaho 15, 21, 437 P.3d 15, 21 (2019)).

To establish standing, a plaintiff must demonstrate: "(1) an injury in fact, (2) a sufficient causal connection between the injury and the conduct complained of, and (3) a like[lihood] that the injury will be redressed by a favorable decision." *Id.* at 419, 497 P.3d at 173 (alteration in original) (quoting *State v. Philip Morris, Inc.*, 158 Idaho 874, 881, 354 P.3d 187, 194 (2015)). An injury cannot be conjectural or hypothetical; it must be "concrete and particularized." *Id.* This Court has previously clarified that this requires a showing of a "distinct palpable injury" and "fairly traceable causal connection between the claimed injury and the challenged conduct." *Id.* (quoting *Young v. City of Ketchum*, 137 Idaho 102, 104, 44 P.3d 1157, 1159 (2002)). As a result, "a citizen and taxpayer may not challenge a governmental enactment where the injury is one suffered alike by all citizens and taxpayers of the jurisdiction." *Miles v. Idaho Power Co.*, 116 Idaho 635, 641–42, 778 P.2d 757, 763–64 (1989). In those situations, the proper forum for the plaintiff's complaint is "to reshape the challenged governmental policy" in the political arena and through the voting process. *Id.*

In *Miles*, we rejected a similar standing challenge to an electricity ratepayer who filed a declaratory action for himself, and all similarly situated Idaho Power ratepayers, to have a portion of legislation declared unconstitutional. 116 Idaho at 636–37, 778 P.2d at 758–59. The legislation in question concerned Idaho Power's implementation of a landmark water agreement—the "Swan Falls Agreement"—involving competing water rights in the Snake River. *Id.*; *see also Idaho Power*

7

*Company v. State ex re. Dep't of Water Res.*, 104 Idaho 575, 661 P.2d 741 (1983). When Idaho Power argued that the case was non-justiciable on standing grounds, this Court rejected the argument. *Miles*, 116 Idaho at 637, 778 P.2d at 759. We recognized that a citizen and taxpayer cannot challenge a governmental enactment inflicting an injury "suffered alike by all citizens and taxpayers of the jurisdiction." *Id.* at 641, 778 P.2d at 763. However, we explained that "the standing doctrine should not be evoked to usurp the right to challenge the alleged denial of constitutional rights in a judicial forum." *Id.* at 642, 778 P.2d at 764. *Miles* did not deal with a "generalized grievance" affecting the "general populace of Idaho," but a "specialized and peculiar injury" that impacted the ratepayers and customers of Idaho Power. *Id.* While the legislation impacted "a large class of individuals," the ratepayers were still a "selected class" suffering a widespread injury. *Id.* Thus, Miles, "as a ratepayer," could challenge the legislation implementing the Swan Falls Agreement. *Id.*

In the case at hand, whether the Plaintiffs have alleged a distinct and palpable injury turns on whether they have brought their claims as generalized taxpayers or as parties in an injured class. This case is analogous to *Miles* because the Plaintiffs are raising their claims as injured property owners. The City passed the Resolution and it affects a large class of individuals, namely property owners within the City of Moscow. While the Resolution has widespread impact, the challenge to the Resolution is not a general grievance because the Resolution does not impact the "general populace" of the jurisdiction—indeed, not every resident in the city limits is a property owner. Many residents opt to rent properties, rather than own them, whether for commercial or residential use. Thus, the class of "property owners" is not the general populace of Moscow. The Plaintiffs here are owners of both their personal residences as well as multiple tenant-occupied properties.

Additionally, the Plaintiffs have alleged a specific and particular injury that distinguishes them from the general populace. While the City is correct that the Plaintiffs' opposition to paying a tenant's water bills is hypothetical at this stage, as none of their tenants have unpaid bills, the Plaintiffs allege that the City forced them to enter into unconscionable utility billing agreements under economic duress. More specifically, they maintain that the City called and threatened to turn off water to each property owned by the Plaintiffs if they failed to contract under the new agreements. Thus, the Plaintiffs have also alleged an injury stemming from an allegedly unenforceable contract that imposes an invalid property lien provision. For the purposes of establishing standing, we conclude that the Plaintiffs have alleged a distinct and palpable injury

8

caused directly by the City and its Resolution. Thus, the Plaintiffs have standing to bring their declaratory judgment action and pursue their remedy in the courts.

**B.** ***City of Grangeville* does not prohibit a municipality from collecting a tenant's unpaid utilities from the property owner where the municipality has contractual authority to collect those fees.**

The Plaintiffs' sole issue on appeal is their contention that the district court erred in concluding that the City could impose the agreements with lien provisions on owner-occupied residences. The Plaintiffs maintain that this Court's holding in *City of Grangeville v. Haskin*, 116 Idaho 535, 536, 777 P.2d 1208, 1209 (1989), "provides a reasoned analysis for holding there is no statutory basis for a municipality to hold a property owner liable for the debt of a third-party tenant's water usage." On appeal, the Plaintiffs contend that the district court failed to enumerate its reasons for awarding summary judgment and that it misperceived the real legal issue: whether the City can impose a contractual lien provision for water usage. In response, the City argues that the district court properly determined that its revised billing practices on owner-occupied properties are consistent with this Court's holding in *City of Grangeville* because that case dealt with implied payment agreements that could not be inferred from a city's statutory authority.

Conversely, the City appeals the district court's conclusion that the Resolution, as applied to an owner of rental properties, was invalid. Again, the City contends: (1) *City of Grangeville* did not create a blanket prohibition against holding landlords responsible for a tenant's utility bills and (2) the actual contracts signed by the property owners assuming liability for a tenant's delinquent water bills are a valid, reasonable collections policy under *City of Grangeville*. The Amici add that the City's "water utility policy is fully valid under Idaho law, reasonable, and consistent with the laws and practices of other jurisdictions." They ask this Court "to focus on the broader impact" of the district court's analysis, arguing that "finding that a city cannot contract with the property owner for the services provided to the property places conflicts within a city's duties under the [Revenue Bond] Act."

Each of these appeals, and the Amici's analysis, requires us to reexamine *City of Grangeville* and determine whether the utility billing agreements in this case are in conflict with our decision in that case. Additionally, the district court distinguished owner-occupied properties from nonowner-occupied properties based on its reading of *City of Grangeville*. Thus, we must also examine the district court's conclusion that while it was reasonable to require property owners to contract for the water they consumed, it was unreasonable to require property owners "to

9

contract under duress in order to provide tenants with water, which is a necessity for habitability." For the reasons set forth below, we reach a different result.

"Municipal power is a classic example of derivative power." *Big Sky Paramedics, LLC v. Sagle Fire Dist.*, 140 Idaho 435, 436, 95 P.3d 53, 54 (2004). Municipalities are only authorized to exercise "those powers granted to them [through legislation] or necessarily implied from the powers granted." *Id.* (emphasis omitted) (quoting *City of Grangeville*, 116 Idaho at 538, 777 P.2d at 1211). "If there is a fair, reasonable, substantial doubt as to the existence of a power, the doubt must be resolved against the city." *City of Grangeville*, 116 Idaho at 538, 777 P.2d at 1211. This is especially true where a city exercises its proprietary functions, such as the operation of a water system. *Id.*

One of the powers granted to Idaho municipalities by statute is the power to "contract and be contracted with." I.C. § 50-301. Another is "the power to operate their own utility systems and provide water, power, light, gas and other utility services within the city limits." *N. Idaho Bldg. Contractors Ass'n v. City of Hayden*, 158 Idaho 79, 85, 343 P.3d 1086, 1092 (2015) (quoting *Alpert v. Boise Water Corp.*, 118 Idaho 136, 143, 795 P.2d 298, 305 (1990)); *see also* I.C. §§ 50-323 (domestic water systems), 50-325 (power plants). Complementing this power, the Idaho Revenue Bond Act provides that any city can

> prescribe and collect rates, fees, tolls or charges, including the levy or assessment of such rates, fees, tolls or charges against governmental units, departments or agencies, including the state of Idaho and its subdivisions, for the services, facilities and commodities furnished by such works, or by such rehabilitated existing electrical generating facilities, and to provide methods of collections and penalties, including denial of service for nonpayment of such rates, fees, tolls or charges[.]

I.C. § 50-1030(f); *see also Hill-Vu Mobile Home Park v. City of Pocatello*, 162 Idaho 588, 593, 402 P.3d 1041, 1046 (2017) ("Pursuant to its proprietary function, municipalities may also construct and maintain public works, and charge a fee 'for a direct public service rendered to the particular consumer.' " (internal citations omitted)). These public works must be managed "in the most efficient manner consistent with sound economy and public advantage," with "services . . . furnished at the lowest possible cost." I.C. § 50-1028.

Importantly, a municipality's collection of charges for services from those who use them is based upon principles of contract law. *City of Grangeville*, 116 Idaho at 538–39, 777 P.2d at 1211–12. In other words, contract law obligates the "one who accepts a service to pay for it." *Id.* This was a key ruling by this Court in *City of Grangeville*, which overturned a city's "attempt[] to

10

. . . rewrite those principles to allow collection from the owner," because it lacked a statutory or contractual basis for collection efforts. *Id.*

In *City of Grangeville*, Grangeville brought a small-claims collection case against a property owner to recover $73.51 in delinquent utility charges for services provided to the owner's tenant. 116 Idaho at 536, 777 P.2d at 1209. The tenant had opened his own water, sewer, and sanitation account with the city. *Id.* These services were used exclusively by the tenant. *Id.* After the tenant failed to pay for these services, and the city was unable to collect on the unpaid bills from the tenant, the city sought payment from the property owner pursuant to a city ordinance, which provided:

> Notwithstanding the fact that the customer might be a tenant and might receive the water, sewer or garbage bill, the owner and occupant of any premises using the water, sewer or garbage system, shall be jointly and severally liable for all fees and charges assessed by the city. Any owner of real property renting the same to others, who shall desire to have notification of the monthly charges, shall make written application to the City Clerk for such duplicate billing, and shall be charged, in addition to the water, sewer or garbage services, the actual costs of such duplicate billing.

*Id.* (quoting Grangeville, Idaho, Ordinances § 3-3-6 (1989)). Another ordinance provided that delinquent utilities would result in a lien on the property to which services were provided. *Id.* at 537, 777 P.2d at 1210. However, there was no contract—"oral or written"—existing between the property owner and Grangeville to make the owner liable for bills incurred by a tenant. *Id.* at 536, 777 P.2d at 1209. From these facts, the magistrate court "interpreted I.C. § 50-1813 to authorize liens for assessments applicable to city domestic water systems and awarded the city the full amounts claimed against the owner for delinquent water, sewer and garbage bills." *Id.* at 537, 777 P.2d at 1210. On appeal, the district court affirmed. It concluded that provisions in the Idaho Code implied powers to the city to prescribe methods of collection, including the imposition of a property lien or direct personal liability of the property owner. *Id.*

However, in the subsequent appeal to this Court, we reversed, initially recognizing that "the city may collect the charges for the water, sewer and garbage services provided by the city from *those who use the services*." *Id.* at 538, 777 P.2d at 121 (emphasis added). Contract principles obligated the tenant—as the contracting party—to pay for the utility services rendered. *Id.* at 538–39, 777 P.2d at 1211–12. This Court went on to explain that a municipality operating a public water utility—much like a private company—"can make and enforce such reasonable rules and regulations as are in harmony with law and justice, for the conduct of its business and the collection

11

of its water rentals." *Id.* at 539, 777 P.2d at 1212 (quoting *Hatch v. Consumers Co.*, 17 Idaho 204, 215, 104 P. 670, 673 (1909)). Sanctions against a user for a failure to pay would be reasonable.

Nevertheless, this Court concluded that sanctions against the property owner were a different matter. Any authority to impose sanctions on a noncontracting party was wrongfully inferred by Grangeville. Thus, this Court held that it "would be unreasonable [to permit a sanction against the property owner] because it would create a liability not consistent with principles of contract law." *Id.* Additionally, this Court determined that Grangeville lacked authority to impose property liens for delinquent utility services where the legislature had not "clearly demonstrated" an intent to authorize that power to municipalities. *Id.* at 538, 777 P.2d at 1211.

Justice Bistline wrote a separate concurrence to address "whether a landlord can be held responsible for a debt which is incurred by some other person." *Id.* at 539, 777 P.2d at 1212 (Bistline, J., concurring). He cited Idaho Code section 9-505(2) to show that "a promise to answer for the debt of another [has] to be in writing." *Id.* at 540, 777 P.2d at 1213. While Grangeville's municipal code stated that a property owner is jointly and severally liable for a tenant's unpaid bills, Grangeville could not "confer upon itself the power to hold Haskin accountable for his tenants' unpaid open accounts." *Id.* Justice Bistline explained:

> It is a very serious matter to declare that a person may be held liable for some other person's default in paying his monthly bills, and it simply would be unlawful, and likely an unconstitutional deprivation of property, unless, that is, the landlord (or anyone else, for that matter, who is a willing guarantor) has agreed in writing to be responsible.

*Id.* To protect itself from nonpaying tenants, Justice Bistline suggested that Grangeville could "require more substantial security deposits or, alternatively, written guarantees before opening new accounts with new customers." *Id*. In a dissent, Justice Huntley explained that Grangeville's ordinance was enacted under the city's basic powers and was akin to laws "sustained throughout the United States." *Id.* at 541, 777 P.2d at 1214 (Huntley, J., dissenting).

We recognize that the holding in *City of Grangeville* is unclear and requires some clarification from us in this appeal. At the time it was decided, *City of Grangeville* split the Court into three camps. Two justices concurred in holding that a city "can make and enforce such reasonable rules and regulations as are in harmony with law and justice, for the conduct of its business and the collection of its water rentals." *Id*. at 539, 777 P.2d at 1212 (majority opinion) (citation omitted). Justice Bistline wrote a separate concurrence wherein he disagreed with the majority's analysis but concurred in the result. *Id.* at 539–40, 777 P.2d at 1212–13 (Bistline, J.,

12

concurring). Justice Huntley dissented and would have upheld the city's actions. *Id.* at 540–41, 777 P.2d at 1213–14 (Huntley, J., dissenting). The fifth justice—Justice Shepherd—sat on the case but did not participate in the opinion due to his untimely death. *See id.* at 539, 777 P.2d at 1212 (majority opinion). Thus, we have a three-justice majority agreeing on the outcome, but only a two-justice plurality agreeing on the reasoning.

Revisiting *City of Grangeville* 35 years later, we do not agree with the broad interpretations each party proposes, or the narrow ruling articulated by the district court. What is clear from *City of Grangeville* is that the right to collect for unpaid services turns on contract law and reasonable rule making. The one "who accepts a service" is obligated to pay for it. *Id.* at 538–39, 777 P.2d at 1211–12. Likewise, a public utility may "make and enforce such reasonable rules and regulations as are in harmony with law and justice, for the conduct of its business and the collection of its [fees]." *Id.* at 539, 777 P.2d at 1212 (citation omitted). These are principles that resonate through the majority opinion, concurrence, and even the dissent—for surely "[i]nherent in the power to operate such a system is the power to collect reasonable fees to operate the system." *City of Grangeville*, 116 Idaho at 540, 777 P.2d at 1213 (Huntley, J., dissenting).

Importantly, this case differs from *City of Grangeville* in a significant way: here, the City has created a revised billing process that requires property owners to sign a written agreement with the City before water will be provided to the real property—whether it is occupied by the owner or a tenant. In other words, the City has stopped contracting directly with tenants and now requires property owners to assume liability for a tenant's unpaid bills. While tenants may still be billed directly, it is the property owner who must complete the utility services application. In contrast, *City of Grangeville* prohibited a city from pursuing a tenant's delinquent bills against a landlord when it had no contractual authority to do so. In other words, the case did not hold that Grangeville lacked the power to hold the property owners liable, but, rather, it held that Grangeville lacked contractual authority to hold a third party responsible for a debt where there was no written contract with the property owner. *See id.* at 538–39, 777 P.2d at 1211–12 (majority opinion) ("This right to collect does not depend on any expressed or implied power of the city, but rather on principles of contract law that obligate one who accepts a service to pay for it."). The *City of Grangeville* Court also did not create a blanket prohibition to bar a municipality from ever requiring a landlord to act as a guarantor of a tenant's utilities. Rather, it held that a city "may collect" the charges for services provided by public utilities, which right turns on "principles of contract law." *Id.*

13

Indeed, a city's policy of creating landlord liability for unpaid water bills is an acceptable practice across the United States to efficiently run the public water services and protect the City from unpaid bills. This is a common rule sustained across our sister jurisdictions. *See* 49 Am. Jur. 2d *Landlord and Tenant* § 501. Likewise, some courts have authorized or indicated that a city can protect itself by declining to contract directly with tenants and obtain a landlord's guarantee to preserve lien rights. *See, e.g.*, *REO Enters., LLC v. Vill. of Dorchester*, 947 N.W.2d 480, 491 (Neb. 2020); *Berke v. City of Miami Beach*, 568 So. 2d 108, 109 (Fla. Dist. Ct. App. 1990). The United States Court of Appeals for the Eleventh Circuit explained:

> Requiring a landlord's joinder in the application for utilities serves to remind each owner of his obligations and liability to the [c]ity and therefore, furthers the goal of collection by reducing the possibility that the [c]ity will be faced with the administrative expenses of repeatedly resorting to cumbersome and expensive foreclosure proceedings. A financial deposit sufficient to provide the [c]ity with the same degree of security would indeed be burdensome to any potential tenant.

*DiMassimo v. City of Clearwater*, 805 F.2d 1536, 1542 (11th Cir. 1986). After all, "a landowner, whose property is readily subject to liens and foreclosure may be rationally presumed to be more readily held to account as the ultimate guarantor of the bills than a tenant who may freely abandon the lease, leaving behind only his outstanding debts." *Id.* at 1541. The United States Supreme Court has even upheld the imposition and enforcement of a lien against a landlord's property for her tenant's unpaid water bills, explaining that the tenant's default "did not relieve the property, which we may say, would be unfit for human habitance if it could not get water." *Dunbar v. City of New York*, 251 U.S. 516, 518 (1920).

Accordingly, we conclude that our holding in *City of Grangeville* permits written agreements as an acceptable means for a city operating a public utility to protect itself from delinquent bills. Therefore, we hold that the district court incorrectly applied *City of Grangeville* when it concluded that the City could never recover the amount due for unpaid water bills directly from the property owner. However, these conclusions do not resolve all the issues before us. Having determined that *City of Grangeville* permits written agreements with a landlord to guarantee utility payments, we must next consider whether the contract the City seeks to enforce is a lawful one.

**C. While the utility billing agreements at issue here were not secured under duress, they are too vague and indefinite to be enforceable.**

14

The Plaintiffs attack the enforceability of the utility billing agreements in several ways. First, they argue that the utility billing agreements are unconscionable adhesion contracts and, second, they maintain that they were forced to enter the contracts under the threat of economic duress. In making these arguments, the Plaintiffs also contend that "[a]dding a contractual lien provision in an attempt to circumvent the holding in *City of Grangeville v. Haskin*, without informing the Plaintiffs/Appellants that this was a provision that they were not obligated to enter into was an obscure if not deceptive provision with major ramifications that the Plaintiffs/Appellants had no real opportunity to understand or bargain for." This "deception" thus "provided no real opportunity or ability for the Plaintiffs/Appellants to bargain or negotiate against the terms contained in the New Contract, or decline the lien provision at all." Importantly, the Plaintiffs attack the lien provisions as invalid and unenforceable regardless of whether the agreement concerns an owner-occupied or tenant-occupied property. We will address each issue in turn.

1. *The district court erred in concluding that the utility billing agreements were secured under duress.*

The district court adopted the Plaintiffs' position on duress, concluding that the Plaintiffs were essentially "strong armed" into signing the agreements by the City's threat of water shutoffs. The district court concluded that the agreements "circumvent" the *City of Grangeville*'s holding by forcing the Plaintiffs "to contract under duress in order to provide tenants with water, which is a necessity for habitability." The City challenges these conclusions. It argues that the district court's finding that the Plaintiffs entered into the agreements "under duress" was unsupported in law. The City further maintains that the court's decision to grant summary judgment as to rental properties was incorrectly predicated on the unavoidable reality that the City's water system was "the only game in town." As explained by the Amici in their brief, the City's monopoly on water service is not the result of any improper actions to discourage competition by the City:

> The lack of competition in the market to provide drinking and wastewater services did not occur by happenstance, but rather from deliberate legislative action. As this Court stated during Idaho's centennial year, "[t]he clear state policy is to displace competition in the providing of utility service with regulation of a monopoly public service." *Alpert v. Boise Water Corp.*, 118 Idaho 136, 141, 795 P.2d 298, 303 (1990). While cities that provide water and sewer services to their residents may lack competition, they maintain responsibility to taxpayers and ratepayers to operate within their budgets . . . ."

15

Where a party claims economic duress, the party must prove: (1) "that it involuntarily accepted the terms offered by the other party," (2) "that the circumstances permitted no other alternative," and (3) "that the circumstances were the result of coercive acts of the other party." *Primary Health Network, Inc. v. State, Dep't of Admin.*, 137 Idaho 663, 668, 52 P.3d 307, 312 (2002); *see also Lomas & Nettleton Co. v. Tiger Enters., Inc.*, 99 Idaho 539, 542, 585 P.2d 949, 952 (1978). "Mere financial embarrassment or reluctance to accept the offered terms do not constitute economic duress." *Isaak v. Idaho First Nat'l. Bank*, 119 Idaho 988, 989, 812 P.2d 295, 296 (Ct. App. 1990), *aff'd*, 119 Idaho 907, 811 P.2d 832 (1991). Rather, "[t]he assertion of duress must be proven by evidence that the duress resulted from the defendant's wrongful and oppressive conduct and not by the plaintiff's necessities." *Primary Health Network*, 137 Idaho at 668, 52 P.3d at 312.

The first two prongs of the test for economic duress are easily met here. The Plaintiffs have clearly established that they involuntarily entered the billing applications and that the circumstances provided no other alternative for securing water at their respective properties. There is no dispute that the City is the only source of water within Moscow's city limits. However, we agree with the City that the third prong of the test has not been met. The Plaintiffs have not proved that the circumstances were the result of coercive acts by the City.

Undoubtedly, the City has a substantial interest in obtaining payment for the water it provides to its customers, and this revised billing policy was enacted through a valid legislative process to address a serious economic drain on municipal resources. As noted by the Amici, "a municipal water system must pay for itself by law. A city is charged with running that system efficiently and consistent with sound economy, at public advantage, and at the lowest possible costs." *See* I.C. § 50-1028 ("Any city acquiring, constructing, reconstructing, improving, bettering or extending any works pursuant to this act, shall manage such works in the most efficient manner consistent with sound economy and public advantage, to the end that the services of such works shall be furnished at the lowest possible cost."). The mere fact that the City was the only available source of water does not automatically render its efforts to fund its system a coercive act, particularly where written guarantees are a permitted means to collect on a tenant's delinquent bills.

Likewise, the City's efforts to reasonably enforce its policies per the Resolution's timeline do not constitute duress. To be sure, a winter shut off is significant. One of the greatest protections

16

to private utility customers in the state is the Public Utilities Commission's "winter moratorium," which prohibits a utility provider from shutting off the gas or electricity—*i.e.* heating services—during the months of December, January, and February if a customer cannot pay the utility bill and the customer has children, elderly or ill people in the home. Public Utilities Commission, *Idaho's Winter Payment Plan*, https://puc.idaho.gov/Fileroom/PublicFiles/Consumer/Winter%20Payment%20Plan%20Factsheet.pdf (last updated March 20, 2020). Yet the course of events here greatly undermines the Plaintiffs' duress argument. They were on notice of the revised policy for nearly a year. The City issued letters and newsletters alerting all property owners of the Resolution and upcoming changes to public water services. The "threat" of the shut off is more reflective of the Plaintiffs' necessities than the City's conduct, and we cannot agree with the Plaintiffs that the City's actions amounted to "coercive," "oppressive," or "wrongful" acts.

> 2. *We cannot determine whether the terms of the utility billing agreements are unconscionable because they impose a vague and indefinite lien provision that renders the agreements unenforceable.*

In a footnote of its memorandum decision, the district court concluded "in the alternative" to duress that it "would find the contractual lien provision is unconscionable and against public policy" and that the utility contracts for rental properties are "contracts of adhesion." There was no analysis conducted by the court in reaching this conclusion; instead, the determination was briefly stated with citations to *Lovey v. Regence BlueShield of Idaho*, 139 Idaho 37, 42, 72 P.3d 877, 882 (2003), and *Federal National Mortgage Association v. Hafer*, 158 Idaho 694, 702, 351 P.3d 622, 630 (2015). The City argues that this finding is "completely without merit," while the Plaintiffs challenge the lien provision as "obscure if not deceptive . . . with major ramifications that [they] had no real opportunity to understand or bargain for."

A court of equity cannot rewrite contracts to make them more equitable or relieve a party from a bargain merely because of hardship. *Lovey*, 139 Idaho at 41, 72 P.3d at 881. Equity may instead intervene where "unconscionable conduct is serious enough to justify the court's interference." *Id.* at 41–42, 72 P.3d at 881–82. However, "[f]or a contract or contractual provision to be voided as unconscionable, it must be both procedurally and substantively unconscionable." *Id.* at 42, 72 P.3d at 882. "Procedural unconscionability concerns the bargaining process leading up to the formation of a contract," while "[s]ubstantive unconscionability focuses on the terms of

the contract." *Trumble v. Farm Bureau Mut. Ins. Co. of Idaho*, 166 Idaho 132, 144–45, 456 P.3d 201, 213–14 (2019).

Here, the district court made a conclusory finding that the utility billing agreements were "unconscionable" adhesion contracts; however, not all contracts of adhesion are inherently unconscionable. A contract of adhesion is an agreement "expressed in the language of a standardized contract, written by the more powerful bargainer to meet its own needs, and offered to the weaker party on a 'take-it-or-leave-it basis.' " *Hafer*, 158 Idaho at 702, 351 P.3d at 630 (quoting *Lovey*, 139 Idaho at 43, 72 P.3d at 883). The utility billing agreements at issue here undoubtedly are adhesion contracts because the City provides the only source of water for Moscow residents and its agreement for utility services are new, nonnegotiable, contracts with local property owners on a "take-it-or-leave-it basis." However, as explained in *Lovey*, a contract of adhesion "cannot be held procedurally unconscionable solely because there was no bargaining over the terms." 139 Idaho at 43, 72 P.3d at 883. "Adhesion contracts are a fact of modern life" and "are not against public policy." *Id.* Thus, a lack of choice, standing alone, does not render such a contract invalid. *See id.*

The greater issue here lies in the terms of the agreement itself. The City contends that the utility billing agreements are valid under *City of Grangeville* and that these agreements, with their lien provisions, are a reasonable collection method for the City to protect itself against delinquent tenants. In determining whether the district court erred in its conclusion that the agreements are unconscionable, we must first determine the type of lien the City means to enforce through the agreement.

A lien is "[a] legal right or interest that a creditor has in another's property," that generally lasts "until a debt or duty that it secures is satisfied." *Lien*, Black's Law Dictionary (11th ed. 2019). Yet, liens come in many shapes and sizes, including mechanic's liens, materialman's liens, execution liens, judgment liens, or voluntary liens. *See id.* The type of lien dictates both the requirements of the claim and the procedures to impose it. For example, a mechanic's or materialman's lien is statutory. The Idaho Code sets forth the contents of the lien claim and mandates that a claim be filed with the county recorder within 90 days of completing service. I.C. § 45-507. In contrast, the charging lien of an attorney is equitable and triable in court. *Frazee v. Frazee*, 104 Idaho 463, 466, 660 P.2d 928, 931 (1983).

18

Here, the Plaintiffs argue that the lien provisions of the City's utility billing agreements are unconscionable for being "obscure if not deceptive" and imposing "major ramifications" where there was "no real opportunity to understand or bargain" the terms. However, we cannot say whether the "obscure" lien provision is unconscionable largely because the language is too vague to ascertain what the City means to enforce. "Liens" are referenced twice in the agreement and each reference lacks explanation and clarification. First, the agreement states that "the City may pursue any available legal remedies for nonpayment of any and all unpaid balances due for utility services, including but not limited to discontinuing utility services and placing a lien on the real property to secure all amounts due." Second, the agreement provides, more conspicuously, "LIENS MAY BE PLACED ON THE PROPERTY FOR NON-PAYMENT." Neither of these provisions provides any clarity as to what type of lien is being created or how it will be imposed. Read together the two provisions create even more ambiguity, as one seems to warn of litigation ("the City may pursue . . . placing a lien on the real property") while the other indicates liens in the plural may be attached directly to the Plaintiffs' property by the City without court involvement.

It is unclear if the liens referenced in the agreement's language fall into a class of tax liens, assessment liens, judgment liens, mortgage liens, or mechanics' liens, all of which operate upon the property directly, or whether this is another class of lien entirely. This leaves many unanswered questions. Can the City try to collect its charges from a forced sale of the property itself? Is the City authorizing a right to attach a lien upon the property directly? Or is the City declaring that it will seek a judgment lien against a property owner in court for the unpaid bills the owner has guaranteed to pay? Further concerns abound. Without knowing the type of lien created by the agreement, the provisions offer no notice as to when and under what circumstances a lien will attach, what happens next in terms of foreclosing on a lien, what kind of notice to the property owner is required, whether redemption is allowed, and so on. Not only is the City asking the Plaintiffs to agree to a lien provision they—and we—cannot understand, the city attorney would be at a loss as to how to enforce a lien against a property that falls into default.

We have long held that "[a] contract must be complete, definite and certain in all its material terms, or contain provisions which are capable in themselves of being reduced to certainty." *Geringer Cap. v. Taunton Props., LLC*, 172 Idaho 95, ____, 529 P.3d 760, 766 (2023) (quoting *P.O. Ventures, Inc. v. Loucks Fam. Irrevocable Tr.*, 144 Idaho 233, 238, 159 P.3d 870,

19

875 (2007)). "An agreement is unenforceable if it is 'so vague, indefinite and uncertain that the intent of the parties cannot be ascertained . . . .' " *Silicon Int'l Ore, LLC v. Monsanto Co.*, 155 Idaho 538, 547, 314 P.3d 593, 602 (2013) (quoting *Griffith v. Clear Lakes Trout Co.*, 143 Idaho 733, 737, 152 P.3d 604, 609 (2007)). Where that occurs, "courts are left with no choice but to leave the parties as they found them" for "there has been no 'meeting of the minds' which is necessary for contract formation. *Griffith v. Clear Lakes Trout Co.*, 143 Idaho 733, 737, 152 P.3d 604, 608 (2007).

As the Plaintiffs have argued, these lien provisions are "obscure" and they have been given "no real opportunity to understand" the potential ramifications of signing the agreement for water services. While they framed this argument under the question of whether an unconscionable provision unravels the contract, we are left grappling with a contract so vague and indefinite that it is not capable of being enforced in the first place. Thus, while we cannot say whether the City crafted an oppressive contract provision, we can conclude that the lien provision is vague, indefinite and uncertain. Where the City has not argued that the lien provisions are severable, we conclude these deficiencies are fatal and render the utility billing agreements unenforceable.

We note, however, that our decision in this matter should not be read to mean that the City lacks contractual authority to include lien provisions in its utility billing agreements going forward. Instead, our holding today only concludes that these utility billing agreements, as written, are unenforceable pursuant to basic contract principles. The Plaintiffs were left with no understanding as to what type of lien they were agreeing to in the guarantee or how it could impact their real property rights. Likewise, we cannot say what type of lien the City would try to enforce against them.

Finally, in challenging the lien provisions, the Plaintiffs contend that the agreements are unenforceable for both a property owner's personal accounts and a tenant's account alike. We agree. The district court correctly stated that it is reasonable for property owners to pay for the water they consume; however, these lien provisions—for both owner-occupied properties and nonowner-occupied properties—suffer from the same infirmities in that they are vague and indefinite in setting forth the key terms of the agreement and the rights of the parties. Thus, we agree with the Plaintiffs that the district court erred in distinguishing between the two property types and in dividing the summary judgment awards between them.

20

Accordingly, we conclude that the district court did not err in awarding summary judgment to the Plaintiffs on the issue of tenant-occupied properties (albeit on different grounds), but it erred in awarding summary judgment to the City on the issue of owner-occupied properties. Because the lien provisions are unenforceable, the Plaintiffs were entitled to summary judgment on both issues as a matter of law. Thus, we affirm the summary judgment award to the Plaintiffs but reverse the award of summary judgment to the City. Because these issues are dispositive to the appeal, we need not address the remaining arguments concerning Idaho's Consumer Protection Act.

### D. Neither party is entitled to attorney fees on appeal.

The City requests attorney fees pursuant to Idaho Code sections 12-117 and 12-121 because it argues that the Plaintiffs' (and the district court's) reading of *City of Grangeville* and the record is at odds with the realities of each. Idaho Code section 12-117 "directs the Court to award attorney fees 'in any proceeding involving as adverse parties a state agency or a political subdivision and a person,' if it 'finds that the nonprevailing party acted without a reasonable basis in fact or law.' " *Watkins v. City of Ponderay*, 172 Idaho 461, 465–66, 533 P.3d 1257, 1261–62 (2023) (quoting I.C. § 12-117). The Plaintiffs also request attorney fees and costs under Idaho Code sections 12-107 and 12-121. Idaho Code section 12-107 provides costs to the prevailing party, while section 12-121 gives a court discretion to award attorney fees "to the prevailing party" when it "finds that the case was brought, pursued or defended frivolously, unreasonably or without foundation." "Party" under section 12-121 includes the state of Idaho or a political subdivision thereof. I.C. § 12-121; *see also Sanders v. Bd. of Trs. of Mountain Home Sch. Dist. No. 193*, 156 Idaho 269, 272–73, 322 P.3d 1002, 1005–06 (2014).

Here, the Plaintiffs have prevailed in overturning the award of summary judgment to their opponent. However, we do not agree with the Plaintiffs that the City brought or defended the respective appeals frivolously, unreasonably or without foundation. This case generated complex questions of municipal and contract law, and required clarification of our prior holding in *City of Grangeville*. Therefore, we decline to award attorney fees on appeal for these reasons. However, as the prevailing party, the Plaintiffs are entitled to an award of costs as a matter of right. I.A.R. 40(a).

## IV. CONCLUSION

For the foregoing reasons, we affirm the judgment of the district court in part and reverse in part. The Plaintiffs were entitled to summary judgment as a matter of law. Therefore, this matter

21

is remanded to enter judgment consistent with the views expressed in this opinion. Costs are awarded to the Plaintiffs as the prevailing party.

Chief Justice BEVAN, Justices BRODY, ZAHN and MEYER CONCUR.